# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 15, 2018
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2016-SC-000366-MR

DATE 3/8/18 Kim Redmon, DC

CHRISTOPHER ESPER                                                    APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE GREGORY M. BARTLETT, JUDGE
NO. 14-CR-01022

COMMONWEALTH OF KENTUCKY                                            APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Christopher Esper appeals as a matter of right from the Kenton Circuit Court's judgment convicting him of first-degree rape, victim under 12 years of age, for the rape of his six-year-old niece, and sentencing him to twenty-five years' imprisonment. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND.

On September 28, 2014, Esper's six-year-old niece ("the victim") presented at the doctor with symptoms of vaginal discharge and burning during urination. Her lab test for gonorrhea came back positive. As a result, Detective Nick Klaiss began investigating the possible sexual assault of the victim. Because the case involved a juvenile, the Cabinet for Health and Family Services ordered that all the men in the victim's household be tested for

gonorrhea, which included her step-grandfather and two uncles (one of whom was Esper). Only Esper tested positive for gonorrhea, and for the same strand as the victim.

After learning of the lab results, Det. Klaiss went to the home of Esper's girlfriend on October 9, 2014, and told Esper that he needed him to come to the police station for an interview. At the station, Det. Klaiss read Esper his *Miranda*[1] rights; Esper then signed a waiver form indicating that he understood his rights and was willing to voluntarily talk with the police.

Esper initially denied having sexual contact with the victim. Eventually, Esper confessed that sexual contact with the victim had occurred one time after he had ingested two Xanax pills and while he was giving the victim a bath. Esper detailed the incident – he was standing outside of the bathtub and entered the victim's vagina from behind while she was standing in the bathtub, facing away from him. He said the intercourse lasted about two minutes. At trial, the victim described the incident similarly: she testified that Esper touched her private part "in a bad way" while she was in the bathtub. Esper wavered on when the incident occurred; he originally said last winter (February or March of 2014) then later said more recently, about two months ago (August or September of 2014). Esper eventually admitted that it occurred after his 18th birthday, which was July 26, 2014.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

Near the end of the interrogation, Det. Klaiss asked Esper if he would like to write a letter to the victim. Esper said yes and proceeded to write the following:

> Dear [victim]: This is uncle Chris. Im writing this letter to you to let you know Im very sorry for my horrible actions. You are innocent. Your smart, funny and a blessing brought to this world. I seen you since you were a newborn and you're growing up so fast it seems like yesterday. *I will accept the punishment given to me.* I'm guilty and ashamed of my actions. You didn't deserve any of this. I hope oneday this will all be flushed down the drain and will be a great family all over again. you just keep going to school and having fun. Listen to mommy and grandpa. Danny too, he's your biggest uncle. I Love you and I am truly sorry. I will take help for this horrible behavior. Sincerely: uncle Chris[2]

(emphasis added). At trial, Det. Klaiss read this letter in its entirety to the jury, despite Esper's motion to redact the sentence, "I will accept the punishment given to me."

Leading up to trial, Esper filed a motion to suppress the recorded interrogation, arguing that he was not properly advised of his *Miranda* rights, and that any waiver of his *Miranda* rights was not voluntarily, knowingly, and intelligently made. Following a suppression hearing, the trial court denied Esper's motion, finding that he was properly advised of, and waived, his *Miranda* rights, and that Det. Klaiss's interrogation techniques were not unduly coercive so as to overcome Esper's free will.

On the Thursday before the Tuesday, April 26 scheduled trial date, the court held a pretrial conference to discuss pending motions, and expressed

---

[2] The letter contains numerous grammatical errors, which we have not corrected.

3

concern over Esper's last-minute motions. One motion was for exculpatory evidence relating to records of the victim's March 30, 2016, meeting with prosecutors, during which she had made allegations of sexual contact against her other uncle and her grandmother as well. Since no investigation into the allegations against the other uncle and grandmother was underway, Esper wished to use the victim's "demonstrably false" allegations to impeach her credibility pursuant to *Dennis v. Commonwealth*, 306 S.W.3d 466 (Ky. 2010), and to also present an "alternate perpetrator" defense.

In response, the Commonwealth indicated it did not believe the victim's allegations to be false, but nonetheless had no plans to investigate what it described as vague allegations against the other uncle and grandmother. The Commonwealth further pointed out that the victim's other allegations had no bearing on the sexual contact alleged in this case, which was substantiated by the gonorrhea lab results and Esper's confession. Esper stated that he would file a motion to continue the trial date, suggesting that in the interim the victim's allegations could be investigated. The trial court determined that the victim's allegations against the other uncle and grandmother were not demonstrably false and therefore would not be admissible at trial. The court stated it would proceed with the April 26 trial date.

On Monday, the day before trial, the court held another pretrial conference and stated that it had been informed on the Friday before at 2:00 p.m. that Esper wished to plead guilty. However, Esper changed his mind over the weekend, and now sought to file a constitutional challenge to the *Dennis*

4

standard, requesting a one-week continuance to inform the Attorney General and give defense counsel more time to prepare for trial. The trial court denied Esper's motion for a continuance, emphasizing that the child victim and expert witnesses were entitled to resolution of the case, which had been pending since December 2014. The court further noted that it lacked authority to declare the *Dennis* case unconstitutional.

On the morning of trial, Esper again requested a continuance on grounds that counsel had not prepared for trial over the weekend since Esper had indicated the Friday before that he wished to plead guilty. The trial court denied defense's motion to continue, noting that the case had been set for trial since January 2016 and defense had had ample time to prepare. At this point, Esper's lead defense counsel stated that she could not ethically or physically do the trial and that she was resigning "as of now." She then left the courtroom. Esper's second chair defense counsel remained, but also indicated that he had not reviewed all the records, was not prepared to go forward, and would certainly be "ineffective." The trial court observed that there had been no hint the previous week during the pretrial conference that defense counsel would not be prepared to try the case, and expressed concern over the ethical considerations of lead defense counsel quitting the day of trial.[3] The two prosecutors stated that they had received the case just two weeks earlier, had

---

[3] In his Brief, Esper states that sometime after the final sentencing and before the filing of his Brief, lead trial defense counsel retired from the Department of Public Advocacy.

stayed up until 3:00 a.m. preparing, and were ready to proceed. The Commonwealth emphasized that nothing had changed since the pretrial conference the week before, except for Esper changing his mind about pleading guilty.

The trial court proceeded with voir dire, and Esper's second chair defense counsel actively participated. Esper's lead defense counsel returned to the courtroom before opening statements and participated in the remainder of the trial. During the three-day trial, Esper testified, as well as the Commonwealth's nine witnesses: the victim, two police officers, three doctors, two nurses, and one lab technician. The videotaped interrogation (including Esper's confession), and Esper's apology letter were presented to the jury. Ultimately, the jury convicted Esper of first-degree rape, victim under 12 years of age, but was unable to unanimously agree on a penalty, so the trial court imposed a twenty-five-year sentence. This appeal followed.

## ANALYSIS.

### I. The Trial Court Did Not Abuse Its Discretion by Denying Esper's Motions to Continue.

Esper was indicted in December 2014. His case was originally scheduled for trial on January 20, 2016, but was continued until April 26, 2016 because one of the Commonwealth's material witnesses was scheduled for surgery and unavailable to testify. On the Thursday before the Tuesday trial date, at the pretrial conference, the defense did not indicate that it was unprepared or had not received all discovery from the Commonwealth. Rather, defense indicated that it wished to introduce at trial the victim's allegations of sexual abuse

6

against her other uncle and her grandmother to impeach the victim on cross examination, and present an alternative perpetrator defense. Esper requested a continuance to investigate the victim's other allegations, which the trial court denied. At the pretrial conference the day before trial, Esper again requested a continuance, which the court again denied.

On the morning of trial, Esper renewed his motion for a continuance, with defense counsel emphasizing their heavy caseloads, physical exhaustion, and their belief that they could not meet their legal and ethical obligations to present an adequate defense for Esper if the case went to trial that day. The trial court denied the motion to continue, citing the fact that this case was 16 months old, the child victim was prepared to testify, and eight expert witnesses had been subpoenaed to testify.

Esper now argues that he was denied his right to a fair trial because the court refused to grant a continuance. With respect to a trial court's broad discretion and factors to be considered in granting a continuance, this Court has stated:

> Under RCr[4] 9.04, the trial court may, "upon motion and sufficient cause shown by either party, ... grant a postponement of the hearing or trial." The trial court's discretion under this rule is very broad, and the denial of a motion for a postponement or continuance does not provide grounds for reversing a conviction "unless that discretion has been plainly abused and manifest injustice has resulted.'" *Hudson v. Commonwealth*, 202 S.W.3d 17, 22 (Ky. 2006) (quoting *Taylor v. Commonwealth*, 545 S.W.2d 76, 77 (Ky. 1976)). Whether a continuance is warranted in a particular case depends on the totality of the circumstances, *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991), *overruled on*

---

[4] Kentucky Rules of Criminal Procedure.

*other grounds by Lawson v. Commonwealth,* 53 S.W.3d 534 (Ky. 2001), but often important are the following factors to be considered by the trial court:

> length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice.

> *Snodgrass,* 814 S.W.2d at 581. Identifiable prejudice is especially important. Conclusory or speculative contentions that additional time might prove helpful are insufficient. The movant, rather, must be able to state with particularity how his or her case will suffer if the motion to postpone is denied. *Hudson,* 202 S.W.3d at 23 (collecting cases).

*Bartley v. Commonwealth,* 400 S.W.3d 714, 733 (Ky. 2013).

Esper asserts that a continuance was warranted due to defense counsels' lack of preparation and the exculpatory evidence revealed during the victim's March 30 meeting with prosecutors, wherein she alleged sexual contact with her other uncle and her grandmother. Esper maintains that the victim's allegations merited further investigation, and could be used to challenge the victim's credibility during trial, as well as possibly identify alternate perpetrators of the sexual contact.

Esper's assertions must be balanced against the following considerations: his case had been pending for 16 months, the trial court had already continued it once, and defense counsel had had ample time to prepare. Considering the parties had not entered into a formal plea agreement, defense counsel should have anticipated and been prepared for the possibility of the case going to trial as scheduled. Further, the Commonwealth had subpoenaed

8

eight expert witnesses to testify, all of whom were professionals with busy schedules. And the case involved a child victim who, according to the guardian ad litem, had been suffering trauma in anticipation of the trial. Despite claims of exhaustion and unpreparedness on the part of Esper's counsel, the record shows that defense counsel actively participated throughout the trial. Lastly, the victim's allegations against her other uncle and her grandmother were irrelevant to the case against Esper; his attempt to present an alternative perpetrator defense does not eviscerate the undisputed fact that he had tested positive for the same strand of gonorrhea as the victim, and was the only adult in the household who did.

Accordingly, we believe the *Bartley* factors weigh heavily in favor of denying Esper's motion to continue. Moreover, Esper has shown no identifiable prejudice resulting from the denial of his request for a continuance. "In these circumstances, where no identifiable prejudice has been shown, the trial court cannot be said to have abused its discretion by deciding against the obvious inconvenience of postponing a trial on the verge of its commencement." *Id.* at 734. Esper's "on-the-verge-of-trial request was untimely, and its untimeliness was not the result of late disclosure by the Commonwealth[.]" *Parker v. Commonwealth*, 482 S.W.3d 394, 404 (Ky. 2016). His request for a continuance was "not necessitated by the late disclosure of evidence with 'articulable' exculpatory potential, and thus the denial of that request was not prejudicial." *Id.* "Conclusory or speculative contentions that additional time might prove helpful are insufficient." *Morgan v. Commonwealth*, 421 S.W.3d

9

388, 393 (Ky. 2014) (internal quotations omitted). Under these circumstances, therefore, the trial court did not abuse its discretion by denying Esper's motions to continue.

## II. Esper's Confession Was Properly Admitted.

Esper moved to suppress the recorded interrogation on grounds that Det. Klaiss coerced his confession by using manipulative interrogation techniques, thereby rendering it involuntarily and inadmissible. Specifically, Esper argues that Det. Klaiss made false statements designed to induce a confession from him; minimized the moral seriousness of, and penalty for, the crime; and used his training and experience to exert pressure on Esper to change his story and the date of the incident to after Esper's 18th birthday, so he could charge Esper with a Class A felony.

As an initial matter, we note that during the two-hour interview, which was recorded in full, the door to the interrogation room remained unlocked, and Esper was offered food, drink, cigarettes, and bathroom breaks. Esper never asked to leave the room and never asked for an attorney. At the beginning of the interrogation, Det. Klaiss did falsely tell Esper that he had not yet received the lab results from Esper's gonorrhea test, and that he would have to call the doctors later to obtain them. At trial, Det. Klaiss explained that he had the test results the entire time, but employed this strategy to leave Esper alone in the room for short periods of time while he checked on the test results, so Esper would have time to think about things. Det. Klaiss testified

10

that he used this technique,[5] among others, such as establishing a rapport and minimization of the crime, when interrogating a suspect since in his experience a suspect never confesses right away; instead, a suspect typically denies the allegation at first, provides a little information, and then provides more information after additional questioning. Det. Klaiss explained that his approach was to get Esper to provide details of the incident, and not put words in Esper's mouth.

After Det. Klaiss presented Esper the test results showing he tested positive for gonorrhea, and explaining that the disease is transmitted through sexual contact, the conversation went as follows:

Esper: I'm going to jail for this, right?

Det. Klaiss: I would say, I would imagine so. I'm not going to lie to you. But from here on out, what's important is that people are going to want to hear your side of the story. That's the whole point of this, is that we have all the evidence in the world against you. And that you're going to sound like the uncle creeper.

Esper: That's fucked up man.

Det. Klaiss: And it is.

Esper: It's really like, between my family.

Det. Klaiss: I agree that it's fucked up. But I don't think it has to be fucked up. Because, uh, I've been doing this for years, I've heard about every explanation in the book. And people that are sitting in your seat are scared, they're nervous, and they don't think people are going to believe them.

---

[5] Det. Klaiss testified he used tactics learned via the Reid Technique of Interviewing and Interrogation, which was developed in 1947 and is a commercial trademarked product that is sold to police agencies by John E. Reid & Associates, Inc. through seminars, books, videos and training material. *See* http://www.reid.com. Reid's seminal publication, *Inbau & Reid Criminal Interrogations and Confessions,* is now in its fifth edition.

11

Esper: Yeah.

Det. Klaiss: But believe me, that everyone that I've heard, and when I tell people, they're like yeah I've made a mistake in my life, I could see how that could happen. It puts a personal touch to the story. Makes people believe in second chances. Because if they don't have the story, they just have all the evidence, they think, why should we give this dude a second chance.

Esper: Right.

Det. Klaiss: But when they have the story, and they have the second....they have what happened, the background is what I call it, then they'll want to give that guy a second chance. Because they want to believe people have just made a mistake. Especially somebody like you, I already ran you through all the courts, you have no criminal record. But in order to get that second chance, and get people believing in that, we need to know what happened. I have all the evidence to show that it did happen and you're giving all the signs that it did happen, Chris, I'm just being honest with you. I believe that it was something that only happened once, I don't think we're talking about years of abuse or anything like that because quite frankly, if I did think that then we wouldn't be sitting here. I'd just pick you up and take you into jail. But that's not what we do when we think it's something that only happened one time. If it happened once, we can talk it through. Make sure it doesn't happen again. That's all that matters.

Esper: It happened one time, man. It happened one time, man.

Det. Klaiss: Alright. Tell me what happened.

Esper: I wasn't feeling good. Came back from a friend's. He gave me Xanax. Popped two pills. Two Xanax pills. And I came home, and [the victim] and I, we was just chilling, talking, hanging out, watching tv. And she wanted to take a bath. So we took a bath, I gave her a bath. My mom wasn't there, she works third shift, and I was there late night. I was her guardian, but I wasn't 18, I was 17. I didn't get in the bath with her. She got in the bath, and uh, she started taking a little bath and uh, that's it man.

Det. Klaiss: And then what happened?

Esper: I didn't...I didn't. This is bullshit, man. This is a mistake.

12

Det. Klaiss: It is a mistake.

Esper: I didn't get in there and start having sex with my niece, man.

Det. Klaiss: Ok. What happened?

Esper: The rag, man, I was playing with the rag. I was washing [inaudible] the rag. But before like I just broke up with my girlfriend. Straight up. I'd go in the bathroom and I didn't really like have a lot of girls to have sex with so I'd go to the bathroom and I'd ejaculate you know what I'm saying. I'd wipe it off with a rag and I'd use that same rag.

Det. Klaiss: Ok, we're getting closer. I'm not going to lie, when semen hits oxygen it starts dying. So I know it's not from ejaculating and then doing it later. I know it sucks, I know it's hard to talk about.

Esper: Yeah.

Det. Klaiss: But I do believe you're talking about the right thing with the bathtub, but you're not telling the whole story. And that's ok, it tough as shit, Chris, it's hard to talk about. It's hard to talk about stupid shit you do that's wrong, much less something like this. But I know what really happened in the bathtub.

Esper: I got in the bathtub and uh was kind of high off pills.

Det. Klaiss: How many Xanax do you think you took?

Esper: I took two, two and a half.

Det. Klaiss: How often do you usually take them?

Esper: I don't take them a whole lot.

Det. Klaiss: I mean, so you were pretty fucked up then?

Esper: Yeah I was pretty fucked up. There was something that, off that high, it's like a high that...you can't even remember twenty minutes ago, you can't remember ten minutes ago. Depends on how you treat your high. You know what I'm saying. I can't remember what happened, man. But I do remember what happened, man.

13

Det. Klaiss: Right, tell me what happened.

Esper: [says victim's name]...ugh, talking this out. I put it inside her.

Det. Klaiss: Inside her vagina?

Esper: Yeah, I put it in her vagina.

Det. Klaiss: How long do you think it happened?

Esper: Maybe a minute or so, man.

Det. Klaiss: Did you ejaculate?

Esper: Nah, nah.

Det. Klaiss: Ok.

Esper: [inaudible]...wintertime.

Det. Klaiss: Last winter?

Esper: Yes.

Det. Klaiss: So, like almost a year ago?

Esper: Yeah, a year ago.

Det. Klaiss: Ok.

Esper: But ever since that day, man, it was a big regret.

Det. Klaiss: Mmm hmm, I can tell. I wasn't bullshitting you. I talk to people all day long, I can tell the people who don't care.

Esper: Yeah.

Det. Klaiss: This was rough. I have more to talk to you about, let me get you a cigarette. You want a cigarette?

Esper: Cool.

Det. Klaiss: Alright. You need something else to drink?

14

Esper: Nah, this is fine. I got the water.

Det. Klaiss: You want another water?

Esper: Nah, I'm good.

[Det. Klaiss leaves room. Transcript picks up at next relevant exchange.]

Esper: I don't want to ruin my relationship between my family, man, that's all that matters to me, like, my family, man.

Det. Klaiss: I'm going to tell them it was a one-time mistake. [inaudible] But I'm going to be honest with you, I interview with people all day long. That day when it happened, are you sexually attracted to kids?

Esper: Nah, hell nah.

Det. Klaiss: Ok.

Esper: The thing is, it was the high, man.

Det. Klaiss: Yeah.

Esper: I took a lot of pain pills...the Xanax. It causes horniness and uh but that's what I'm saying. I felt so disgusted after that. Man, to this day, every time I think about that shit, I'm like what the fuck, is there a demon in me, man.

Det. Klaiss: Right.

Esper: It was not a continuous process, I mean, I don't wake up every day looking forward to something like that. It was just a mistake, man, I feel like we all make mistakes.

Det. Klaiss: Yeah, if we all didn't make mistakes we wouldn't be human.

Esper: Right, but I want to get help for this. I want to talk to somebody about this. [inaudible] I feel like I'm a creeper, man.

Det. Klaiss: Was that the only time that it happened?

Esper: Yeah, one time. Once upon a time...the story that is.

Det. Klaiss: Was she completely naked?

Esper: Yes, yes.

Det. Klaiss: Were you completely naked?

Esper: Nah, nah.

Det. Klaiss: And how were your clothes?

Esper: Shirt on, pants pulled down to my knees, that's it.

Det. Klaiss: Ok. Were you in the bathtub?

Esper: Nah, nah.

Det. Klaiss: Where was she at?

Esper: She was standing up in the bathtub.

Det. Klaiss: Ok.

Esper: I remember parts of it, man.

Det. Klaiss: So, if she's standing up in the bathtub, where are you?

Esper: I'm standing right outside the bathtub and she like, I'm still the same length [sic "height"] as her.

Det. Klaiss: So, was she looking away from you?

Esper: Yeah.

Det. Klaiss: Ok. And you entered her from behind?

Esper: Yeah.

Det. Klaiss: Alright. How long do you think it really lasted?

Esper: About two minutes.

Det. Klaiss: Ok. And uh [inaudible] ejaculation doesn't have to occur, but it usually does. If you ejaculated inside of her, that's fine.

Esper: I didn't.

16

Det. Klaiss: It doesn't change anything, you understand that right?

Esper: Yeah, I understand. But, it didn't happen.

Det. Klaiss: So you think you were inside [the victim] for about two minutes? What made you stop?

Esper: Stop, man.

Det. Klaiss: What made you stop?

Esper: It's not me, man, not me. It was the drugs, man, it was the drugs. And anger, man. [inaudible] I didn't grow up having anything. So, it was like a little bit of anger, man. But she doesn't deserve that, man.

Det. Klaiss: Who were you mad at?

Esper: Childhood man.

Det. Klaiss: Just growing up?

Esper: Just growing up. People, things I didn't have. As I got older though that shit flew out the window.

Det. Klaiss: What made you think it was last winter?

Esper: It was last winter 'cause it was wintertime, it was cold. Wintertime is when it happened...this past year. [inaudible] I'm going to be doing serious fucking time for this, man.

Det. Klaiss: You don't have any criminal history so don't worry about all that stuff. Just worry about right now.

Esper: That's what I'm saying. I don't want to mess my life up, man. I'm trying to go to college and everything, man, and this shit just sets me back. What's gonna like happen today?

Det. Klaiss: Well um, I gotta go make another phone call. Do you want to write [the victim] a letter?

Esper: Mmm hmm. I will do that.

Det. Klaiss: You don't have to do it. But if you'd like to, I can give it to her.

17

Esper: This is going to be the last thing before I go to jail?

Det. Klaiss: For right now, you're going to jail, yeah. [inaudible] I'll be right back, ok?

Esper: Ok. [inaudible cross talk]

Det. Klaiss: When's the last time you did any drugs?

Esper: Marijuana uh yesterday. Yesterday, yeah.

Det. Klaiss: About what time?

Esper: Let's see, 9 or 10 o'clock at night.

Det. Klaiss: Ok just wondering, thanks. [leaves room while Esper writes letter, re-enters later].

Det. Klaiss: So I made some phone calls. The one thing they're having trouble with is there's a period of time from last winter to her diagnosis so leads them to believe it happened more recently since then.

Esper: I'll say recently then.

Det. Klaiss: Don't just say recently.

Esper: Yeah, but I don't have like an exact time, man. It happened one time, man.

Det. Klaiss: When was it?

Esper: I don't know.

Det. Klaiss: If it was last week, it was last week.

Esper: Maybe about two months before.

Det. Klaiss: Two months ago?

Esper: Two months ago, yeah.

Det. Klaiss: Ok. Was it summertime?

Esper: School time.

18

Det. Klaiss: And so it happened about two months ago?

Esper: Yeah.

Det. Klaiss: So why'd you say last winter?

Esper: I don't know, man.

Det. Klaiss: You just scared?

Esper: Yeah, a little bit. I don't know what's gonna happen to me...[inaudible]

Det. Klaiss: Well you know people make mistakes.

Esper: That's what I'm saying...[inaudible]

Det. Klaiss: That ain't gonna happen. You have too much to shoot for. You have too much to look for. You're a good kid you just made a simple mistake.

Esper: That's what I'm saying.

Det. Klaiss: So this would have happened after you turned 18 then?

Esper: What?

Det. Klaiss: This. Two months ago.

Esper: Yeah, yeah....yeah, yeah, 18.

Det. Klaiss: Do you remember about how long after you turned 18 that it happened?

Esper: Nah, not exact man. It's kind of like a blur, man..

Det. Klaiss: But you remember it was after your birthday?

Esper: Yeah.

Det. Klaiss: Ok. And it doesn't make any difference to me, Chris. I'm just asking you because this is your chance to get out in front of everything. So it only happened once?

Esper: Yeah, one time. That's what I'm saying. It's not a repeated action, ya know what I mean? I learned from the first time I did, man. I was like, damn. I shouldn't never have did that shit. That fucking drug. [inaudible]

Det. Klaiss: Alright, I'll be right back, ok?

Esper: Alright. [Det. Klaiss leaves room].

When examining a trial court's ruling on a motion to suppress, "[w]e review the trial court's findings of fact for clear error, but legal determinations we examine de novo." *Gray v. Commonwealth*, 480 S.W.3d 253, 259 (Ky. 2016) (footnote omitted). With respect to false statement made by Det. Klaiss during the interrogation (that he had not yet received the test results when in fact he had), the trial court noted that the use of false statements during an interrogation was not prohibited so long as the statements could not be considered to have overwhelmed the defendant's will. *Id.* at 260.

In *Gray,* this Court explained,

> The Due Process Clause of the Fourteenth Amendment precludes the use of involuntary confessions against a criminal defendant at trial. The United States Supreme Court defines an *involuntary confession* as one that is "not the product of a rational intellect and a free will." And "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."

*Id.* at 259–60 (internal footnotes omitted).

The voluntariness of a confession is evaluated using a three-part test: "(1) whether police activity was objectively coercive; (2) whether the coercion overwhelmed the will of the defendant; and (3) whether the defendant has shown that the coercive activity was the 'crucial motivating factor' behind his

20

confession." *Id.* at 260 (internal footnote omitted). Factors to consider include "the defendant's age, intelligence, education, criminal experience, and criminal and mental condition at the time of the interrogation" as well as the "methods employed in the interrogation itself, including whether there was any physical or mental coercion, threats, promises, delay, and the extent of trickery and deception used in questioning." *Id.* Police trickery alone does not automatically result in suppression of a confession. Indeed, "the mere employment of a ruse, or strategic deception, does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion." *Id.* (internal quotation omitted). In *Gray*, this Court found that the defendant's will was overcome during a seven-and-a-half-hour interrogation (most of which was not recorded), in which a large amount of false evidence was presented to the defendant, including a fake DNA report. 480 S.W.3d at 263–64.

In *Leger v. Commonwealth*, 400 S.W.3d 745 (Ky. 2013), this Court held that the police officer's response to a question posed by the defendant during his custodial interrogation vitiated the previously-given *Miranda* warning by assuring the defendant that his statement would not be used against him, but would instead remain between the two of them. In *Leger*, the defendant pointedly asked the officer whether what he was about to tell him would remain confidential/just between the two of them, and not used in a court of law. *Id.* at 749–50. Based on the officer's assurance that it would remain confidential, Leger was induced to incriminate himself. *Id.* This Court held

21

that the officer's assurance of confidentiality directly contradicted the *Miranda* requirement that a suspect be warned that anything he says could and would be used against him in a court of law and, as a result, Leger's confession should have been suppressed. *Id.* at 751. In so ruling, this Court recognized that "our law allows, and should allow, police officers to use deception and artifice to mislead a suspect or lull him into a false sense of security that, *despite his understanding of the Miranda warning,* might prompt him to speak against his own interest." *Id.* at 750 (internal quotations and citation omitted). However, Leger did not ignore a warning that his words could be used against him in a court of law – he directly asked if his words would remain confidential and was expressly told that what he said would not be used against him. "Artful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices, but deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools." *Id.*

More recently, in *Bond v. Commonwealth,* 453 S.W.3d 729 (Ky. 2015), this Court further defined the bounds of acceptable investigative tactics. After giving the suspect a *Miranda* warning, the police officer told Bond that he had a digital audio recorder for his use because "he forgets a lot" and that the digital recorder was "just for him to remember." *Id.* at 733. He then asked Bond if it was okay to record the interview, and Bond said it was. *Id.* Bond later moved to suppress the statements he made during the interview, arguing that the officer's behavior was the same type of behavior this Court condemned in

22

*Leger. Id.* at 733–34. This Court disagreed, noting that the officer simply said the recorder was for his use; he did not assure Bond that his statements would be kept confidential. *Id.* at 734.

Here, Det. Klaiss read Esper his *Miranda* warnings, which Esper chose to waive by signing the *Miranda* waiver form. Esper was 18 years old at the time; nothing in the record suggests that he was under the influence or incoherent, or otherwise not able to intelligently and voluntarily decide to speak with police. He never asked for an attorney or to leave the interrogation room at any point.

Esper complains that Det. Klaiss unfairly minimized the crime and downplayed the potential penalty, thereby coercing him to confess. Det. Klaiss testified at the suppression hearing that he knew rather than a "second chance," 18-year-old Esper's future was a prison sentence of at least 20 years with an 85% parole eligibility date if convicted. However, upon review of the interrogation, we do not believe Det. Klaiss's technique exceeded the bounds of acceptable investigative tactics. Esper was 18 years old at the time of the interrogation; he should have known that having intercourse with his six-year-old niece would result in serious jail time. In fact, when he asked Det. Klaiss if he was going to jail for this, Det. Klaiss responded, "For right now, you're going to jail, yeah." Esper further acknowledged as much during the interrogation, saying, "I'm going to do some serious fucking time for this, man."

Furthermore, with respect to the date of the sexual contact, in addition to Esper's admission that it occurred after his 18th birthday, evidence was

23

presented at trial from the victim's treating physician, Dr. Kristin Belanger, who testified that the victim presented on September 28, 2014 with symptoms of vaginal discharge and burning during urination, which are common symptoms of gonorrhea. Dr. Belanger stated that "with gonorrhea, symptoms typically would appear within 1–2 weeks after sexual contact." That would put the sexual contact occurring during the month of September 2014, clearly after Esper's July birthday. "It has long been the law that the Commonwealth can prove all the elements of a crime by circumstantial evidence. *Commonwealth v. Goss*, 428 S.W.3d 619, 625 (Ky. 2014). Thus, the jury had sufficient proof to believe that the sexual contact between Esper and the victim took place after Esper's 18th birthday, even without Esper's confession.

### III. The Trial Court Did Not Abuse Its Discretion by Admitting Esper's Apology Letter in Its Entirety.

Esper asserts that the trial court abused its discretion by not redacting his apology letter to omit the sentence "I will accept the punishment given to me." Esper does not dispute that the letter was properly admitted under the admissions of a party opponent exception codified in KRE[6] 801A(b)(1). Rather, he argues that "I will accept the punishment given to me" was irrelevant under KRE 402 or, if relevant, its prejudicial effect substantially outweighed its probative value, thereby rendering it inadmissible under KRE 403. In response, the Commonwealth asserts that the statement reflects Esper's state of mind, was relevant, and not unduly prejudicial under KRE 403. The trial

---

[6] Kentucky Rules of Evidence.

court found that the statement went to establishing that Esper was in fact admitting guilt and, given the context, was not unduly prejudicial. Accordingly, the trial court permitted Det. Klaiss to read the letter in its entirety to the jury.

"Evidence which is not relevant is not admissible." KRE 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. The record reflects that Esper voluntarily wrote the letter, which included his willingness to accept the consequences of his actions, making it more probable that he was in fact guilty of the crime. Esper cites to no case law that would preclude admission of this portion of an otherwise admissible statement reflecting a defendant's culpability for the crime for which he is being tried. The statement is clearly relevant.

Moreover, the probative value of the statement is not outweighed by the danger of undue prejudice. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403. The decision to exclude evidence pursuant to KRE 403 is within the sound discretion of the circuit court. *Webb v. Commonwealth*, 387 S.W.3d 319, 324 (Ky. 2012). This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). The test for abuse of discretion is whether the trial court's decision was

25

"arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

*Id.*

Esper has failed to persuade us that the probative value of his statement is substantially outweighed by the danger of undue prejudice. "KRE 403, which is derived from its Federal counterpart, does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case." *Webb*, 387 S.W.3d at 326. Obviously, Esper's statement was detrimental to his case. However, his statement was benign when compared to the content of the letter, including his admission to raping his innocent six-year-old niece, and certainly was not unduly prejudicial. If anything, his statement could have served as mitigating evidence, allowing the jury to infer that he was remorseful and willing to accept responsibility for his actions.

Thus, the trial court did not abuse its discretion by finding that Esper's statement was relevant to establishing guilt, and was not unduly prejudicial. The court's decision to admit the letter in its entirety was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945. Accordingly, this claim of error is without merit.

## IV. The Trial Court Did Not Abuse Its Discretion or Err by Denying Esper's Motion to Strike Two Jurors for Cause.

Esper contends the trial court abused its discretion and erred by failing to excuse two jurors for cause. The decision whether to strike a juror for cause "rests upon the sound discretion of the trial court and on appellate review, we will not reverse the trial court's determination unless the action of the trial

court is an abuse of discretion or is clearly erroneous." *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 192 (Ky. 2017) (internal quotations omitted).

During voir dire, the trial court asked if any of the prospective jurors, their family members, or a close friend, had been the victim of a crime. Juror 9 approached the bench and stated that her aunt had been robbed and murdered in Covington approximately 20 years earlier. Juror 9 acknowledged that Esper's case was a different case involving different charges, and when asked whether her aunt's murder would impact her ability to decide Esper's case, the juror responded that this was a rape case and she would be okay. She stated that she had not been involved in her aunt's trial, and the perpetrator had been found guilty and was still in prison. She also stated that she did not think anything about her aunt's case would cause her to favor the prosecution or not view Esper impartially. Esper moved to strike Juror 9 for cause "just based on her experience." The trial court denied his motion.

Juror 10 approached the bench and stated that her aunt had been brutally murdered in 2007 in Minnesota. The trial court asked if that would have any bearing on her ability to serve as a juror in this case, and she stated she did not know if it would affect her decision. The trial court pointed out that her aunt's murder and Esper's case were different crimes involving different people; in response, this juror said she thought it would be fine and nodded her head affirmatively. Juror 10 stated that she had not been involved in her aunt's trial and the perpetrator had been prosecuted. When defense counsel asked if anything about her aunt's process would cause her to give

27

more credibility to the prosecution's witnesses, she stated she did not know; she was glad to see her aunt's perpetrator convicted. She stated, "I don't know if it would affect." She was not questioned further.

Esper moved to strike, arguing that Juror 10 had equivocated about her ability to remain impartial. The Commonwealth pointed out that this potential juror had realized Esper's case was a separate proceeding. The trial court noted that the juror's aunt's case had taken place years ago in Minnesota, and that this was not a situation in which a potential juror had been unhappy with the system and felt the need for retribution; the fact that a family member had been a crime victim simply was not enough to strike when the juror also stated that she could perform her job as a juror. Accordingly, the trial court declined to excuse Juror 10 for cause. Both Juror 9 and 10 ended up sitting on the jury panel. Esper now argues that the trial court's decision not to strike these two jurors was an abuse of its discretion and erroneous.

In *Sturgeon*, this Court reexamined and clarified the standard for judging for-cause challenges of prospective jurors, conceding that "we have allowed the standard for judging for-cause challenges of prospective jurors to drift too far from its anchor: RCr 9.36(1)." *Id.* at 193.

> RCr 9.36(1) plainly and succinctly establishes the standard by which trial courts are to decide whether a juror must be excused for cause. The rule says: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified."

*Id.* Over time, "the test" that evolved for determining whether a prospective juror should be excused for cause became "'whether, after having heard all of

28

the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.'" *Id.* (quoting *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky. 1994)). In *Sturgeon*, we explained that "[t]aken in context, the expression in *Mabe* was accurate, but its appropriation in other cases to stand as 'the true test' for addressing for-cause challenges to prospective jurors is misleading. RCr 9.36(1) is the only standard to be applied[.]" 521 S.W.3d at 194–95.

Here, the question is whether reasonable grounds exist to believe Jurors 9 and 10 could not have rendered a fair and impartial verdict on the evidence, and therefore should have been excused for cause. The fact that a family member of a juror was a victim of a *similar* crime is insufficient, in and of itself, to warrant removal for cause. *Bowling*, 942 S.W.2d at 299. If being the victim of a *similar* crime is insufficient to mandate excusal, certainly having a family member who was the victim of a *different* crime would likewise be insufficient alone to mandate recusal. When questioned, Juror 9 made clear that nothing about her aunt's circumstance would cause her to be partial in Esper's case. Thus, the trial court properly declined to strike her.

Juror 10 initially stated that she did not know whether her aunt's murder would affect her in this case, but after the trial court noted the distinctions between her aunt's case and Esper's, the juror said she thought it would be fine and nodded her head affirmatively. Defense counsel followed up, asking if it would cause her to give more credibility to the Commonwealth's

witnesses. She stated, "I don't know if it would affect." No further follow-up questions were asked.

In *Paulley v. Commonwealth*, 323 S.W.3d 715 (Ky. 2010), this Court held that the trial court committed reversible error by refusing to strike for cause a prospective juror who had been a victim of a *similar* crime and who was unsure she could listen to all the evidence and not allow her previous experience to cloud her ability to consider the defendant's case. In the case at bar, neither juror was involved in the prosecution of their aunts' murder cases, and in both cases, the convicted murderers were sent to prison. No apparent desire for retribution was present in either juror, seeking to redress a prior miscarriage of justice. Furthermore, after the trial court emphasized the distinction between the crimes committed in their aunts' cases, and the crime Esper was accused of committing, both jurors concluded that they would in fact be "okay" and "fine." Based on our review of the record, we do not believe a reasonable doubt existed as to the jurors' ability to remain impartial and fair, that would require excusing them for cause. As a result, the trial court did not abuse its discretion or act erroneously by declining to strike these jurors.

## CONCLUSION.

For the foregoing reasons, the judgment and sentence of the Kenton Circuit Court is affirmed.

All sitting. Minton, C.J.; Hughes, VanMeter and Wright, JJ., concur. Keller, J., concurs in result only. Cunningham, J., dissents by separate

30

opinion in which Venters, J., joins. Venters, J., dissents by separate opinion in which Cunningham, J., joins.

CUNNINGHAM, J., DISSENTING: Respectfully, I dissent.

I fully concur with the excellent scholarship and analysis by Justice Venters in his dissent. I only write to offer a more charitable hand to the interrogating police officer in this case.

We should fully applaud and endorse the manner in which the police officer conducted his interrogation in this case. Aesop was one of the first to recognize and report that we get more out of people by being kind than being mean. The officer in this case was highly professional and considerate. For this I highly commend him.

There is no question, in my mind, that there is nothing inappropriate for law enforcement to obtain confessions by appearing to be a defendant's friend and even confidant, and luring the accused into a false sense of security and well-being. Even misleading and deceitful statements in drawing out incriminating confessions are an acceptable part of the interrogation process.

However, when it comes to the constitutional rights of the suspect, they must not be unclear, or diminished in their importance. Neither should they be contradicted by subsequent comments from the person reading the rights and doing the questioning. *Miranda* has been around for over 50 years now and these rights are given in most cases by rote. I'm afraid that it has become common practice to hurry through them in such a perfunctory manner that

31

they lose their meaning. Or, as in this case, are spoken and then subsequently countermanded.

It is true that coming clean and confessing will help the defendant to a degree. An investigative officer who has dealt with a cooperative and confessing suspect is highly likely to put in a good word to the prosecutor, which might lighten the penalty to be recommended by the State.

However, this ameliorating assistance to a defendant pales in comparison to the damning consequences of admitting to committing a crime. In this case, the advantages of making incriminating statements were overplayed by the interrogator. I therefore fall in line with the thrust of the dissent by Justice Venters.

Venters, J., joins.

VENTERS, J., DISSENTING: I respectfully dissent. Imagine if cigarette manufacturers were allowed to follow the mandatory cancer warning on the cigarette pack with a retraction promising the smoker many healthful advantages if he will just keep on smoking. That is exactly what the Majority does to the *Miranda* warnings.[7]

It is indeed ironic that this Court, which lacks the power to overrule *Miranda*, now hands the power to do so to every police agency in this state. The Majority says, in effect, to police: "Even when you give the *Miranda* warnings to a suspect in custody, you may immediately retract them with false promises that

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the warnings are not true; and, that instead of being used against him in a court of law, anything he says will really be used to help him. By the Majority's rationale, the police may also vitiate the other great element of the *Miranda* warnings by telling a properly *Mirandized* suspect: "you are not really going to get a lawyer appointed to represent you so you might as well talk to us now."

In exactly that way, this Court now sanctifies a begrudging and barely-perceptible recitation of the *Miranda* warnings and turns a blind eye toward the ardent and convincing retraction of that warning with false assurances to an 18-year-old suspect that the courts will give a "second chance," a lighter sentence, including, perhaps, "family counseling," if he will confess to the crime.

We should not wince at calling that constitutional error; but we do.

## I. THE POLICE VITIATED THE *MIRANDA* WARNING BY ASSURING ESPER THAT A CONFESSION WOULD BE USED TO HELP HIM GET A LENIENT SENTENCE

We show complete disrespect for the constitutional mandate of *Miranda*, which requires the police to warn a suspect that "anything you say can and will be used *against* you in a court of law," when we allow the police to immediately rescind the warning with a deceitfully polite promise that his confession will be used to get him a "second chance." We would unanimously condemn a police officer's false promise to pay a young suspect $1,000.00 for his confession. Why then are we so reticent when, instead of using cash, the police purchase the same confession with the false promise of a "second chance" and some "family counseling?"

We addressed this issue in *Leger v Commonwealth*, 400 S.W.3d 745, 750 (Ky. 2013). Citing several cases from around the country, we said: "Requiring police to give the proper *Miranda* warning and then allowing it to be countermanded with a false assurance that the suspect's statements *will not* be used against him, requires suppression of any statements the suspect makes thereafter during the interrogation." 400 S.W.3d at 751 (citation and quotation marks omitted). Quoting *Lee v. State*, 12 A.3d 1238, 1247-1248 (Md. 2011), we said:

> Since *Miranda* was decided, courts have applied the principles of that case and its progeny to hold that, after proper warnings and a knowing, intelligent, and voluntary waiver, the interrogator may not say or do something during the ensuing interrogation that *subverts those warnings and thereby vitiates the suspect's earlier waiver* . . . .

400 S.W.3d at 749.

*Leger* emphasized that "artful deception" was a valuable and legitimate law enforcement tool, but *Leger* also drew the very bright line that "deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools. . . . As the warnings are constitutionally required, interrogation techniques designed to mislead suspects about those warnings are impermissible." *Id.* at 750-751 (citation and internal quotation marks omitted).[8]

---

[8] We recognized in *Gray v. Commonwealth*, 480 S.W.3d 253, 263 (Ky. 2016), that deceptive interview techniques which, through the use of falsified documents, exploit a suspect's fear and induce a confession are presumed to be unconstitutional. The Commonwealth bears the burden of establishing that its deceptive tactic did not overwhelm the defendant's will and was not a critical factor in securing the confession.

*Leger* marked the boundary line for permissible police interrogation tactics at the point of countermanding any of the *Miranda* warnings. When that line is crossed, it is as though the *Miranda* warning was never given. Officer Klaiss crossed the line by assuring Esper that, because he was young and had no criminal record, he would get a second chance and people would want to help him if he would abandon his claim of innocence and confess. Despite his certain knowledge that Esper's confession could not lead to a "second chance" or "family counseling," and that whatever Esper said would be used against him, Klaiss told Esper exactly the opposite: confess and "they'll want to give a guy [who confesses] a second chance." It matters not whether Esper even heard Klaiss' mumbled *Miranda* warning because Klaiss quickly retracted it with this contrary warning: "*In order to get that second chance, and get people believing in that, we need to know what happened.*" Everything Esper said after that, including his apology letter, was involuntary and inadmissible. *Leger*, 400 S.W.3d at 751.

The Majority offers a meaningless factual difference to distinguish this case from *Leger*. What matters is that in both cases the police countermanded *Miranda* by promising the suspect that his confession would not be used against him. In *Leger*, the officer promised the suspect that his statement would not be used against him because it would be kept confidential. Here, the officer promised Esper that his confession would not be used against him

35

because everybody that heard it would then feel compelled to give him a "second chance." In both cases, the police countermanded the *Miranda* warning by assuring a suspect that anything he said would NOT be used against him, which is the exact opposite of what *Miranda* requires.

For over two generations, the courts of this nation and this Commonwealth have steadfastly maintained that police officers must warn suspects of their right to remain silent, and that the *"warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court."* *Miranda*, 384 U.S. at 469 (emphasis added). We would do well to remember the reason for the rule:

> This warning is needed in order to make [the suspect] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. . . . [T]his warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.
>
> . . . **Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end.**

*Id.* at 469-470 (emphasis added).

Klaiss' rapid and sometimes mumbling speech during the interrogation makes the audio recording somewhat difficult to discern. While I do not entirely agree with the Majority's transcription of the essential parts of the

36

interrogation, our differences are immaterial. It is clear that Klaiss began the interrogation of Esper by dutifully mumbling the obligatory *Miranda* warnings in a flat monotonic voice, spending scarcely one second on the "anything you say will be used against you" part. After Esper had repeatedly protested his innocence, Klaiss spent a major part of interrogation assuring Esper that if he confessed, everything would get better for him. Klaiss told Esper if he confessed, "we'll get something in place for you," hinting that "family counseling" would be the consequence of a confession. Klaiss then constructed the interview to lead Esper into a confession that fit all the parameters of the crime as Klaiss believed them to be. Klaiss knew, as the *Miranda* warning attests, that Esper's confession would be used to put him in prison for a term of at least 20 years with an 85% parole eligibility date. Klaiss buried the *Miranda* warning beneath his persistent assurance that Esper's confession would assure him a "second chance" and maybe family counseling. The Majority thinks that's okay; I think it's a constitutional violation and a contemptable insult to the dignity of this Court's duty to apply and enforce the *Miranda* rule.

I further submit that the error cannot be brushed aside as harmless. Esper had just turned 18 and the victim's account of when the crime occurred was ambiguous. The medical analysis was inconclusive because, even assuming she contracted gonorrhea from Esper, the available evidence showed only that she had symptoms of gonorrhea *after* Esper's 18th birthday. But, the police had no evidence to show when those symptoms first appeared. It was

37

entirely plausible that the victim was infected "in the winter" before Esper turned 18. This ambiguity in the proof created a reasonable doubt that blocked Klaiss' path to prosecution. Even if Esper confessed to the crime, he could not be convicted without proof beyond a reasonable doubt that the crime happened *after* his 18th birthday.

Therefore, Klaiss knew he had to continue the interrogation, building upon the false assurances that confession would result in lenient treatment with a series of leading questions designed to manipulate Esper's confession toward a date after his 18th birthday. Without that evidence, there was not proof beyond a reasonable doubt to sustain the Commonwealth's burden of proving that Esper was an adult when the crime occurred. We cannot turn another blind eye from the seriousness of this error by calling it harmless beyond a reasonable doubt.

I believe that great harm is done to constitutional authority when government agents are allowed to subvert *Miranda* by convincing a suspect that *Miranda* is the lie and that the false assurance that a confession will only be used in court to help him is the truth. We were warned against an unhealthy police dependence upon confession in *Escobedo v. Illinois*:

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.

378 U.S. 478, 488-489 (1964) (footnotes omitted). The Majority opinion disregards that warning as cavalierly as it undermines the constitutional values embedded in *Miranda.*

For those reasons, I dissent.

## II. THE "REID" TECHNIQUE

Although my disagreement with the Majority is entirely based upon Klaiss' rescission of the *Miranda* warning, I write further to point out rising criticism of the Reid Interrogation Technique which the Majority failed to mention. The late Justice (then-Court of Appeals Judge) Wil Schroder reminded us in *Herndon v. Commonwealth,* "the 'Reid' interrogation method . . . is notorious for producing false confessions."[9]

The United States Supreme Court specifically identifies "the Reid method" at least eleven times in the *Miranda* opinion as a psychologically-coercive stratagem for which the *Miranda* warnings were crafted.[10] The Court observed that "[w]hen normal procedures fail to produce the needed result" the police resort to "deceptive stratagems" of the Reid method to "persuade, trick, or cajole [a suspect] out of exercising his constitutional rights." 384 U.S. at 455. Numerous law journals validate the Supreme Court's concern. For example, Welsh S. White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions,* 32 Harv. C.R.-C.L.L. Rev. 105, 119 (1997),

---

[9] 2000-CA-002734-MR, 2004 WL 2634420 at *3 n. 9 (Ky. App. Nov. 19, 2004).

[10] *See* 384 U.S. at 449 nn. 9-10; 450 nn. 12-13; 452 nn. 15-17; 454 nn. 20-22; 455 n. 23.

states: "But, as experts in psychology have noted, suspects who deny guilt will sometimes experience anxiety during [a Reid] interrogation even though they are not deceiving the police with respect to the offense of which they are accused."

The use of the Reid Technique on youthful suspects is even more suspect: "The special vulnerability of youthful suspects has been recognized. In particular, research has shown that juveniles as a class are not able to understand the nature and significance of their *Miranda* right." *Id.* at 157 n. 200.[11]

When presented with a well-developed record based upon competent academic and scientific expertise, it would be appropriate for this Court to consider the evidentiary validity of confessions obtained using the Reid Interrogation Technique. Until then, I would place upon the Commonwealth the heavy burden of establishing the validity of any self-incriminating evidence derived by its use of the Reid Interrogation Technique.

Cunningham, J., joins.

---

[11] *See also* Barry C. Feld, *Police Interrogation of Juveniles: An Empirical Study of Policy and Practice*, 97 J. Crim. L. & Criminology 219, 244 (2006) (citations omitted):

> Youths' diminished competence relative to adults increases their susceptibility to interrogation techniques and concomitant risks of false confessions. Adolescents have fewer life experiences or psychological resources with which to resist the pressures of interrogation. Juveniles' lesser understanding of legal rights or consequences increases their vulnerability to manipulative tactics. They think less strategically and more readily assume responsibility for peers than do adults. They are more likely to comply with authority figures and to tell police what they think the police want to hear.

COUNSEL FOR APPELLANT:

Samuel N. Potter
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Susan Roncarti Lenz
Assistant Attorney General

41