# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 30, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-000189-MR

KEVIN IPINA-GARCIA                                          APPELLANT

V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LUCY ANNE VANMETER, JUDGE
CASE NO. 17-CR-00152

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Kevin Ipina-Garcia entered a conditional guilty plea to murder, first-degree wanton endangerment, and tampering with physical evidence and was sentenced to thirty-three years of imprisonment. His plea was conditioned on his ability to appeal the trial court's denial of his motion to suppress statements that he made to the police during his interrogation. He now appeals that denial of his motion to suppress and argues that the warnings given prior to his interrogation did not comply with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966), thereby violating the Fifth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution. He also asks this Court to review the trial court's final judgment to the extent it ordered him to pay $165.00 in court costs. Having reviewed the record and the

arguments of the parties, we hereby affirm the decision of the Fayette Circuit Court.

## I.  BACKGROUND

On November 24, 2016, fourteen-year-old Angel Juarez was fatally shot in Lexington, Kentucky. Lexington police quickly identified Ipina-Garcia as a suspect based on witness statements, and they attempted to locate him. However, he was not at his home and his family informed police that he was fleeing to North Carolina. Lexington police pinged Ipina-Garcia's cell phone and found him traveling on I-64 in West Virginia. The Lexington officers then relayed this information to West Virginia police officers, who apprehended Ipina-Garcia on November 25, 2016. He was taken to the Western Regional Jail just outside of Huntington, West Virginia. That same day, Detective Bill Brislin and Detective Steven McCowan traveled to the Western Regional Jail to speak with Ipina-Garcia. Officer Lorenzo Bueno, a native Spanish-speaker, accompanied the two officers to act as an interpreter because the officers were unsure if Ipina-Garcia spoke English.

The interview lasted approximately one hour and twenty-one minutes. At the outset, Detective Brislin provided *Miranda* warnings to Ipina-Garcia in English. He read these warnings from a pre-printed form. The form did not have the *Miranda* warnings printed in Spanish, however.[1] Rather, Officer Bueno interpreted the English version of the *Miranda* warnings to Spanish.

---

[1] There was some confusion at the suppression hearing as to whether Officer Bueno read the *Miranda* warnings from the form. He initially testified that the form had the warnings written in English at the top and Spanish at the bottom, and he had

Officer Bueno testified at the suppression hearing that after he finished his recitation of the *Miranda* warnings, Ipina-Garcia responded in the affirmative. More specifically, he testified that Ipina-Garcia responded "yes" multiple times when asked if he was clear on what had just been read to him and if he understood his rights. When asked if the "yes" on the audio recording was his own voice, rather than Ipina-Garcia's, Officer Bueno clarified that he would only have said "yes" if Ipina-Garcia first said "yes." Detective Brislin similarly testified that Ipina-Garcia responded in the affirmative. He testified that Ipina-Garcia nodded his head to indicate that he understood his rights. However, he also testified about a verbal acknowledgment, saying, "I don't think you can clearly hear [Ipina-Garcia's] acknowledgment on the audio" because Ipina-Garcia is "very soft-spoken."

The officers then interrogated Ipina-Garcia about Juarez's death. Detective Brislin lead the interrogation, and Officer Bueno interpreted. Detective Brislin testified that he would ask a question in English, and Officer Bueno would then repeat that question in Spanish. Ipina-Garcia would then answer the question in Spanish, and Officer Bueno would translate the answer into English for Detective Brislin. Detective Brislin testified that Ipina-Garcia appeared to understand what Officer Bueno was asking him. According to Detective Brislin, Ipina-Garcia understood some English because he would nod

read directly from the Spanish version. However, he was shown a copy of the form, which did *not* have the Spanish text on it. He then clarified that he referred to the English on the form and interpreted the English version into Spanish for Ipina-Garcia.

3

his head in response to Detective Brislin or otherwise looked like he understood what Detective Brislin was saying. Officer Bueno also testified that Ipina-Garcia appeared to understand what was being said and was able to respond to the questions. He testified that he heard no protestation and no request to repeat any questions or statements, nor did Ipina-Garcia ever state that he was unclear about something or ask to stop the interview. Ipina-Garcia ultimately admitted to fatally shooting Juarez.

At the conclusion of the interview, the detectives advised Ipina-Garcia that he was being charged with murder. They thanked him for taking the time to speak to the officers and reminded him that he had not been obligated to speak to them, and that was why he had been read his *Miranda* rights. Ipina-Garcia then commented, "Thank God, I feel better having gotten it off my chest."

Ipina-Garcia was ultimately charged with murder, first-degree wanton endangerment, and tampering with physical evidence. He filed a motion to suppress the statements made during his interrogation. He argued that the *Miranda* warnings, as interpreted by Officer Bueno, were insufficient and the waiver of those rights was involuntary.

At the suppression hearing, Detective Brislin and Officer Bueno testified on behalf of the Commonwealth. The defense called one witness: Nidia Pecol, a certified court interpreter and professional translator and interpreter. Pecol testified that she had listened to the audio recording of the interview. During her testimony, the defense attorney, who did not speak any Spanish, repeated

4

certain Spanish phrases from Officer Bueno's recitation of the *Miranda* warnings, and Pecol explained why she believed these phrases were problematic. For example, Officer Bueno used the term "franqueado," but Pecol testified that "franqueado" could mean many things (to open the way to something, to clear the way to something, to pay a tariff and free something from customs, etc.). After reviewing a handful of these terms and phrases, Pecol testified that Officer Bueno's interpretation was "very poor Spanish" and she did not believe it was an effective interpretation of the *Miranda* rights. She also testified that a head nod does "not necessarily" mean "yes" in Hispanic culture; rather, it is often used to show that one is paying attention to the speaker.

The trial judge[2] orally denied the motion to suppress. He explained on the record:

> The court's going to note that Officer Bueno testified that at the time of this interview in November of [2016] that he was working with the Lexington Police Department. He was bilingual and biliterate. He grew up speaking Spanish, spoke Spanish language daily on the job and in the home. He testified that he read his— read *Miranda* warnings to suspects or defendants on a daily basis during the twenty plus years of his career. He testified that he had a dialogue with Mr. Garcia and that he believed Mr. Garcia understood the conversation and was able to understand what he was being told. As the defense points out, in [*Duckworth v. Eagan*, 492 U.S. 195 (1989)], the *Miranda* warnings have to be reasonably conveyed. I think we've heard here from them, your own transcript, that those were reasonably conveyed. I would agree it's probably a better practice to have a pre-printed *Miranda* warning typed in Spanish for all officers. Had that been done here, I think it might

---

[2] At the time of the suppression hearing, Judge John Reynolds was serving as interim judge after the retirement of Judge James Ishmael Jr. Judge Lucy VanMeter then began presiding over this case after her election to the bench.

5

have been a little bit easier to get through this, but it doesn't have to be specific, it just has to be reasonably conveyed, and I think the evidence shows it was, so I will overrule the motion to suppress.

Ipina-Garcia ultimately entered a conditional guilty plea reserving his right to appeal the trial court's denial of his suppression motion. The trial judge[3] issued a final judgment to reflect this plea and sentenced Ipina-Garcia to thirty-three years of imprisonment. The final judgment also ordered Ipina-Garcia to pay $165.00 in court costs. Ipina-Garcia now appeals the trial court's denial of his suppression motion, as well as the trial court's imposition of court costs.

## II.    ANALYSIS

Ipina-Garcia presents two arguments on appeal. He first argues that the trial court erred in denying his motion to suppress because the *Miranda* warnings provided by Officer Bueno were inadequate. He next argues that the trial court erred in assessing court costs against him, as he is a "poor person" under Kentucky Revised Statute ("KRS") 23A.205(2). We address each argument in turn.

### A. Motion to Suppress

As noted above, Ipina-Garcia contends that the *Miranda* warnings, as interpreted by Officer Bueno, were inadequate, and his waiver of his *Miranda* rights was therefore invalid. He argues that, due to the invalid waiver, the

_____

[3] Judge Lucy VanMeter was presiding over this case at the time the final judgment was entered.

6

admission of his statements would violate his right against self-incrimination under the Fifth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution. Thus, he argues, the trial court erred in denying his motion to suppress these statements.

When reviewing a trial court's denial of a motion to suppress, we first "defer to the trial court's factual findings if they are supported by substantial evidence and only review such findings for clear error." *Bond v. Commonwealth*, 453 S.W.3d 729, 732 (Ky. 2015) (citations omitted). "[W]hen the findings of fact are supported by substantial evidence, we review the court's application of the law to those facts de novo." *Id.* (citation omitted). When doing so, "we take care 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

In this case, we must consider whether the *Miranda* warnings provided to Ipina-Garcia were inadequate, thereby rendering his *Miranda* waiver invalid. On this point, we first note that it is the Commonwealth's burden to show that Ipina-Garcia knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Mills v. Commonwealth*, 996 S.W.2d 473, 482 (Ky. 1999), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010). However, "the Commonwealth only needs to prove waiver of *Miranda* rights by a preponderance of the evidence." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

7

We next turn to the case cited by the trial court judge, *Duckworth v. Eagan*, 492 U.S. 195 (1989). In that case, the Supreme Court of the United States explained, "We have never insisted that *Miranda* warnings be given in the exact form described in [*Miranda v. Arizona*]." *Id.* at 202. In fact, the Court had previously explained that "the 'rigidity' of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures." *Id.* at 202–03 (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)) (internal quotation marks omitted). Rather, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*'" *Id.* at 203 (quoting *Prysock*, 453 U.S. at 361). More specifically, *Miranda* requires that the person "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. In *Duckworth*, the warnings, in their totality, "touched all of the bases required by *Miranda.*" 492 U.S. at 203.

Since *Duckworth*, the Kentucky Supreme Court has also considered the adequacy of *Miranda* warnings in various cases. For example, in *Smith v. Commonwealth*, No. 2003-SC-000236-MR, 2004 WL 2364596 (Ky. Oct. 21, 2004), the defendant argued that the *Miranda* warnings provided to him failed to adequately inform him that he could consult with an attorney *prior* to police questioning. We disagreed, noting that Smith was read his rights twice before the interrogation began, and each time he indicated that he understood his

rights. *Id.*, at *4. He was "specifically informed of his right to have an attorney appointed and present during the questioning" as well as his right to stop the interrogation at any time. *Id.* We held that "these two warnings, given simultaneously, essentially informed [Smith] that he could consult with an attorney at any time, even before questioning." *Id.* In other words, "[t]he warnings provided an adequate and understandable appraisal of [Smith's] rights, and did not materially mislead [Smith] in any way." *Id.* (citing *United States v. Caldwell,* 954 F.2d 496, 504 (8th Cir. 1991)).

We reached a similar conclusion in *Coleman v. Commonwealth,* No. 2007–SC–000834–MR, 2009 WL 1110314 (Ky. Apr. 23, 2009). In that case, we considered whether the following *Miranda* warnings were sufficient: "You've got the right to remain silent. Anything you say can and will be used against you in a court of law. You've got the right to an attorney. If you can't afford an attorney one will be appointed to you free of charge." The defendant challenged the adequacy of these warnings, arguing that he was not fully informed that he had a right to an attorney *during questioning.* We ultimately held that the warnings "reasonably conveyed [the *Miranda*] rights to Coleman, and in particular adequately conveyed that his right to an attorney began immediately, prior to questioning, and thus clearly implied that the right applied during questioning as well." *Id.*, at *4. Thus, despite lacking that specific language, the warnings had "reasonably conveyed" to Coleman his *Miranda* rights. *See also Ragland v. Commonwealth,* 191 S.W.3d 569, 585 (Ky. 2006) ("*Miranda* does not require a 'talismanic incantation' as long as the

9

warnings adequately advise the suspect of his *Miranda* rights." (citing *Prysock*, 453 U.S. at 359–60)).

Ipina-Garcia points to another Kentucky Supreme Court case, *Rivera-Reyes v. Commonwealth*, No. 2005–SC–000488–MR, 2006 WL 2986495 (Ky. Oct. 19, 2006), for support. In that case, Rivera-Reyes was arrested on rape charges and subsequently made incriminating statements to the police. However, prior to making these statements, Rivera-Reyes had signed a Spanish version of the *Miranda* rights waiver form and initialed beside each of the enumerated rights. Rivera-Reyes later moved to suppress his statements to police. Relevant to the current appeal, Rivera-Reyes argued that the interpreting police officer was not a competent interpreter and his lack of proficiency in Spanish rendered Rivera-Reyes's waiver involuntary.

On this point, we first acknowledged that "language barriers are certainly factors to be considered." *Id.*, at *6. However, we distinguished the facts of Rivera-Reyes's case from cases in other jurisdictions in which a defendant's waiver had been found to be involuntary. In those cases, the defendant was advised of his rights in English only, or never responded to the *Miranda* warnings, or asked questions that clearly indicated some confusion about the warnings. Rivera-Reyes, on the other hand, had been provided with a Spanish version of his *Miranda* rights, he signed the form he had been provided, initialing each of the enumerated rights, and he made no indication that he was confused. In fact, Rivera-Reyes never asked for an attorney and he had indicated to the officers that he understood his rights. We therefore held that

10

the interpreting officer's lack of proficiency in Spanish did not render the *Miranda* waiver involuntary.

Ipina-Garcia attempts to distinguish his case from *Rivera-Reyes*. He first notes that there was no form with a Spanish translation for Officer Bueno or Ipina-Garcia to read. Rather, Officer Bueno spontaneously interpreted the *Miranda* warnings from English to Spanish, and his interpretation was troublesome. In addition, Ipina-Garcia argues that he did not clearly acknowledge his *Mirada* rights. There was no signed waiver form, and he argues that there was no verbal acknowledgement by Ipina-Garcia. Instead, Ipina-Garcia contends that he only gave a head nod, which can mean something different than "yes" in Hispanic culture. In sum, Ipina-Garcia argues that, given the incompetent interpretation and the lack of a signed waiver form, the Commonwealth failed to meet its burden to show that Ipina-Garcia was properly informed of his rights and knowingly, intelligently, and voluntarily waived those rights.

We disagree. We believe that the *Miranda* warnings provided to Ipina-Garcia reasonably conveyed to him his constitutional rights and were not materially misleading. Our analysis requires a closer look at Officer Bueno's interpretation. At the suppression hearing, the Commonwealth played portions of the audio recording of the transcript, including Detective Brislin's recitation of the *Miranda* rights in English:

> We're police officers. You have the right to remain silent. You do not have to make any statement or answer any questions. Any statement you do make or any questions you do answer may be

repeated at any later hearing or trial, whether it be for you or against you, or for or against any other person. If you decide to make a statement or answer any questions, you need to know that if you change your mind, you have the right to stop giving your statement or answering any questions at any time. You have the right to speak with a lawyer before making any statement or answering any questions. You have the right to have a lawyer here with you during any questioning. If you cannot afford to hire a lawyer, the court can appoint one for you.

The Commonwealth also played Officer Bueno's interpretation of these rights and would periodically pause to allow Officer Bueno to explain what he had said. According to this testimony, Officer Bueno's recitation of the *Miranda* warnings was as follows:

> Kevin, do you understand we're police officers? We're from Lexington. We're reading you your rights. You're not obligated to speak with us. You have the absolute right to remain silent. You don't have to speak to us. Do you understand so far? Kevin, do you understand that if you do decide to speak with us here and now, whatever is said here, whatever is discussed here, can be used against you in front of a tribunal,[4] and that obviously is going to be used against you, whatever you talk about here. If you do decide to speak to us, you can have an attorney present. If you can't afford an attorney, one can be appointed for you. At any time during this interview, an attorney can be present here for you. If you do decide that you want an attorney present, the attorney would be provided for you free of charge.

Pecol, who testified on behalf of the defense, interpreted Officer Bueno's reading of the *Miranda* rights as follows:[5]

> Look Kevin, we are officers, we are police, understand? You have the right to keep silence, maintain the silence. You know that you are not obligated to make any, give us not one word, direct any comment, but to understand, if you decide to participate in this

---

[4] At the suppression hearing, Officer Bueno clarified that "tribunal" is the "the word [he used] in Spanish, meaning court of law."

[5] When providing this interpretation, Pecol included filler words like "uh" and "um." We have omitted those filler words in this Opinion.

interview, what is talked here could be used against you, or what is, also what is talked here could be used against you in a court, much later. And if you decide, during the interview, that you don't want to talk with us, you can also say, "That's it, no more, I wouldn't want to talk with you." If you wish to talk with an attorney before the interview, that also goes. You could communicate with an attorney. And if you decide that you want, that you would want an attorney here present with you, that also goes. And if you cannot pay an attorney, the service would be allowed in your favor, (unintelligible) free, you know what I mean? Do you understand what I'm saying? Okay.

At the suppression hearing, Pecol testified about the parts of Officer Bueno's recitation that she found troublesome. However, even though Officer Bueno's interpretation may not have been an exact recitation of the English version, there is "no talismanic incantation" required to satisfy *Miranda. Duckworth,* 492 U.S. at 203 (quoting *Prysock,* 453 U.S. at 359) (internal quotation marks omitted). Instead, we ask only whether the officer reasonably conveyed the *Miranda* rights to the defendant.

Here, Officer Bueno's interpretation may have differed slightly from the pre-printed English version read by Detective Brislin; however, it did not materially alter the substance of the *Miranda* warnings. Instead, his interpretation adequately advised Ipina-Garcia that he had the right to remain silent, that any statement he made could be used as evidence against him, and that he had a right to the presence of an attorney, who could be appointed for him if he could not afford an attorney. These are precisely the procedural safeguards that the *Miranda* warnings are intended to convey. *See Miranda,* 384 U.S. at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as

13

evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."); *Rivera-Reyes*, 2006 WL 2986495, at \*5. These warnings are conveyed in both Officer Bueno's interpretation printed above and in Pecol's interpretation of Officer Bueno's interpretation.

The testimony at the suppression hearing indicates that, when asked if he understood these rights and if he wished to speak to the officers, Ipina-Garcia responded in the affirmative by nodding his head and verbally stating "yes." According to the undisputed testimony of both Officer Bueno and Detective Brislin, Ipina-Garcia appeared to understand the questions presented to him and responded to those questions appropriately. He never asked for a break or to stop the interview, nor did he give any indication that he did not understand the questions or his *Miranda* rights. Under these circumstances, we believe that the Commonwealth met its burden of demonstrating that Ipina-Garcia's waiver was knowing, intelligent, and voluntary.

Accordingly, under the facts of this case, we hold that the *Miranda* warnings given to Ipina-Garcia reasonably conveyed to him his constitutional rights. His waiver of his *Miranda* rights was therefore valid, and the trial court did not err in denying his motion to suppress.

**B. Order to Pay Court Costs**

Ipina-Garcia next argues that the trial court erred in ordering him to pay $165.00 in court costs. He argues that the trial court had appointed a public defender to represent him and had also allowed him to proceed *in forma pauperis* on the present appeal, and it was therefore error to impose court

14

costs. Additionally, he notes that such court costs were not specifically referenced in his guilty plea document or in the judgment on the guilty plea, nor did the trial court specifically mention court costs at the guilty plea hearing or the final sentencing.

Ipina-Garcia correctly refers to the imposition of court costs as a sentencing issue, citing *Jones v. Commonwealth*, 527 S.W.3d 820 (Ky. App. 2017). As such, the issue is not subject to waiver and can be raised for the first time on appeal. *Id.* at 822. However, because the alleged error was unpreserved, we must review it for palpable error under Kentucky Rule of Criminal Procedure ("RCr") 10.26. *Id.* Under that rule, an appellate court may consider "[a] palpable error which affects the substantial rights of a party . . . even though insufficiently raised or preserved for review" and grant relief "upon a determination that manifest injustice has resulted from the error."

> Under KRS 23A.205(2),
>
> The taxation of court costs against a defendant, upon conviction in a case, shall be mandatory and shall not be subject to probation, suspension, proration, deduction, or other form of nonimposition in the terms of a plea bargain or otherwise, unless the court finds that the defendant is a poor person as defined by KRS 453.190(2) and that he or she is unable to pay court costs and will be unable to pay the court costs in the foreseeable future.

Ipina-Garcia argues that he qualifies as a poor person under this statute and he is unable to pay his fines in the foreseeable future. However, no hearing was ever held to determine if Ipina-Garcia qualifies as a poor person. Instead, he points to the trial court's initial determination that he was indigent, thereby

entitling him to the assistance of a public defender, and the court's order

allowing him to proceed *in forma pauperis* on appeal.

We have previously explained the difference between a poor person and

an indigent person. *See Elliott v. Commonwealth*, 553 S.W.3d 207, 211 (Ky.

2018) (citing *Maynes v. Commonwealth*, 361 S.W.3d 922, 928–29 (Ky. 2012)). A

poor person in this context is one

> who has an income at or below one hundred percent (100%) on the
> sliding scale of indigency established by the Supreme Court of
> Kentucky by rule or is unable to pay the costs and fees of the
> proceeding in which he is involved without depriving himself or his
> dependents of the necessities of life, including food, shelter, or
> clothing.

KRS 453.190(2). An indigent person, on the other hand, "is one who is unable

'to provide for the payment of an attorney and all other necessary expenses of

representation.'" *Elliott*, 553 S.W.3d at 211 (citing *Maynes*, 361 S.W.3d at 929).

Thus, "[i]ndigency and public defender appointment determinations require a

present tense analysis, while poor person status and the imposition of court

costs require consideration of the defendant's present ability to pay and his or

her ability to pay in the foreseeable future." *Id.* (citing *Maynes*, 361 S.W.3d at

929). "It is therefore well settled that an indigent defendant receiving the

services of appointed counsel is not automatically entitled to a waiver of court

costs." *Id.*

Furthermore, when the trial court does not make a determination

regarding the defendant's status as a poor person, or the defendant fails to

16

request such a determination, we will not review the imposition of court costs.

We have explained,

> The assessment of court costs in a judgment fixing sentencing is illegal *only* if it orders a person adjudged to be poor to pay costs. Thus, while an appellate court may reverse court costs on appeal to rectify an illegal sentence, we will not go so far as to remand a facially-valid sentence to determine if there was in fact error. If a trial judge was not asked at sentencing to determine the defendant's poverty status and did not otherwise presume the defendant to be an indigent or poor person before imposing court costs, then there is no error to correct on appeal. This is because there is no affront to justice when we affirm the assessment of court costs upon a defendant whose status was not determined. *It is only when the defendant's poverty status has been established, and court costs assessed contrary to that status, that we have a genuine sentencing error to correct on appeal.*

*Id.* (quoting *Spicer v. Commonwealth*, 442 S.W.3d 26, 29 (Ky. 2014)).

Accordingly, a defendant seeking to avoid court costs must ask the trial court to determine whether he or she qualifies as a "poor person" under KRS 23A.205(2). If the defendant fails to request that determination, and the trial court does not otherwise presume that the defendant is a poor person before imposing costs, "there is no error to correct on appeal." *Id.* (quoting *Spicer*, 442 S.W.3d at 29); *see also Nunn v. Commonwealth*, 461 S.W.3d 741, 753 (Ky. 2015) ("[N]othing in the record reveals that Appellant sought a determination of 'poor person' status under KRS 23A.205.").

In the present case, the trial court did not make a determination as to whether Ipina-Garcia was a poor person under KRS 453.190(2) or whether he was unable to pay court costs and would be unable to pay said costs in the foreseeable future. Ipina-Garcia did not request the trial court to make this

determination. Accordingly, there is no illegal sentence for this Court to review, nor is there any error in the trial court's decision.

## III.   CONCLUSION

For the reasons set forth above, we hereby affirm the decision of the Fayette Circuit Court.

Minton, C.J.; Hughes, Keller, Lambert, Nickell, and Wright, JJ., sitting. All concur. VanMeter, J., not sitting.


COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General