RENDERED: FEBRUARY 19, 2015
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

FINAL

2013-SC-000833-MR

DATE 3-12-15 CColeman D.C.

GARY STEVEN BOND          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE MITCH PERRY, JUDGE
NO. 10-CR-001550

COMMONWEALTH OF KENTUCKY          .      APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A jury found Gary Steven Bond (Bond) guilty of murder and sodomy in the first degree. The court, consistent with the jury's recommendation, sentenced Bond to life without the possibility of parole for 25 years on the murder conviction.[1] The court, consistent with an agreement between Bond and the Commonwealth, sentenced Bond to 20 years' imprisonment on the sodomy charge, to run concurrently with the sentence for murder. Bond appeals his convictions arguing: (1) the court should have suppressed a statement he gave to police; (2) absent suppression, the court should have permitted Bond to play his entire statement for the jury; and (3) the court should have granted a directed verdict on the sodomy charge because there

---

[1] The jury found that sodomy in the first degree was an aggravator under KRS 532.025, justifying the sentence of life without the possibility of parole for 25 years.

was no corroborating proof to support his confession to that crime. For the following reasons, we affirm.

## I. BACKGROUND.

In May of 2010, Mark Shelby (Shelby) was temporarily living with Bond and sleeping on Bond's couch. At approximately 5:30 p.m. on May 11, Shelby arrived at Bond's apartment and found Bond and his girlfriend, Julie Hendricks (Hendricks), getting dressed in the bedroom. The three ate dinner and drank some beer and Jagermeister.[2] At approximately 8:00 p.m. Hendricks passed out on the living room floor. Because Hendricks weighed in excess of 250 pounds, Bond and Shelby could not lift her. Therefore, they dragged her into the bedroom and left her on the floor. Bond covered Hendricks, who was clothed, with a blanket and he and Shelby returned to the living room. At approximately 10:00 p.m., Bond went into the bedroom, and Shelby went to sleep on the couch.

At approximately 1:45 a.m. Bond woke Shelby and said that he thought Hendricks had died. Shelby went into the bedroom and saw that Hendricks, who was nude, was turning blue and appeared to be dead. Shelby encouraged Bond to call 911, which Bond did approximately a half hour later. Emergency personnel confirmed that Hendricks had died and, because the death appeared suspicious, the deputy coroner called the police. Detective Brenda Wescott (Detective Wescott) arrived at Bond's apartment at approximately 4:30 a.m. and interviewed Bond and Shelby. However, because she did not initially believe

---

[2] A fruit flavored German liqueur.

Hendricks's death was a homicide, Wescott did not take any physical evidence from Bond's apartment.

The autopsy report indicated that Hendricks had died as the result of strangulation and that she had had anal sex sometime prior to her death. Based on these findings, police officers returned to Bond's apartment and asked him if he would go to the station to be interviewed. Bond agreed. After reading Bond his rights and obtaining a waiver, Detective John Lesher (Detective Lesher) questioned Bond at length. During that interview, Bond admitted that he had had anal sex with Hendricks while she was unconscious on the bedroom floor and that he had pulled on Hendricks's tee shirt while doing so. However, he stated that he did not think Hendricks died at that time. Later, Bond denied that he had anal sex with Hendricks while she was unconscious, stating that the couple had consensual anal sex earlier in the day and were interrupted by Shelby. Bond also claimed that Lesher concocted the story about him having anal sex with Hendricks while she was unconscious.

The officers arrested Bond and charged him with murder and first-degree sodomy. Prior to trial, Bond moved to suppress his statement, a motion the court denied. At trial, the Commonwealth played portions of Bond's statement and Bond moved for leave to play the entire statement, a motion the court denied. We set forth additional facts about Bond's statement, which is at the center of this appeal, as necessary below.

3

## II. STANDARD OF REVIEW.

The issues raised by Bond have differing standards of review. Therefore, we set forth the appropriate standard as we address each of the issues Bond raises.

## III. ANALYSIS.

### A.    Motion to Suppress.

The standard of review on a suppression motion is twofold. First, we defer to the trial court's factual findings if they are supported by substantial evidence and only review such findings for clear error. RCr 9.78; *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002). Second, when the findings of fact are supported by substantial evidence, we review the court's application of the law to those facts *de novo*. *Roberson v. Commonwealth*, 185 S.W.3d 634, 637 (Ky. 2006). When undertaking that review we take care "to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690 at 699 (1996).

On July 17, 2013, Bond filed a motion to suppress the May 13, 2010, statement he gave to Detectives Lesher, Cohn, and Wescott.[3] Bond did not challenge the fact that he had been advised he had the right to remain silent and to counsel and that he waived those rights before agreeing to speak with

---

[3] Bond raised an issue in his motion before the trial court regarding the statement he gave to Detective Wescott on May 12, 2010. However, his counsel admitted after the evidentiary hearing on that motion that he was not pursuing any issues regarding that statement. Furthermore, he does not raise any issues regarding that statement in this appeal. Therefore, we do not address it.

4

the detectives. However, he argued that the detectives intentionally minimized the significance of the warning about the implications of waiving his rights so as to negate the knowingness of his waiver. He also argued that police conduct during the interviews was unduly oppressive and coercive, thus negating the voluntariness of his waiver. The Commonwealth argued that Bond was not in custody and that he had knowingly and voluntarily waived his rights.

Following an evidentiary hearing, the trial court denied Bond's motion finding that the interrogation was custodial; that Bond had been advised of his rights; and that he had waived them. In doing so, the court noted that Bond never asked the detectives to stop the interrogation, and he never asked to speak with an attorney. The court also found that the tactics used by the detective were "fairly standard."[4] Bond did not file any motions seeking additional findings of fact from the court.

Bond continues to argue on appeal that the detectives' actions vitiated the knowingness and voluntariness of his waiver and were unduly coercive. He also argues that the trial court did not make sufficient findings of fact. The Commonwealth argues to the contrary. We address each issue separately below.

### 1. Knowingness of Waiver.

Bond argues that the detectives negated the waiver of his rights by misleading him as to the significance of the waiver and the nature of the

---

[4] The trial court issued an oral order on the record following the hearing and later entered into the record a similarly worded written order.

interview. In support of his argument, he points to several statements made by the detectives during the interview. At the beginning of the interview, Detective Lesher told Bond that he had a digital audio recorder for his use because he "forget[s] a lot." Detective Lesher then asked Bond if it was okay to record the interview, and Bond said it was. However, Detective Lesher did not tell Bond that the interview was being recorded by a video camera as well as the audio recorder.

After obtaining Bond's consent to record the interview, Detective Lesher asked Bond if he ever watched any true crime stories on television. Bond stated that he did, and Detective Lesher then said, "Okay. Uh, I'm gonna read you your rights, we do this all the time. It's no big deal. Okay?" Detective Lesher then read Bond his rights; Bond agreed that he understood his rights; and he signed a written waiver form. Later in the interview, Detective Lesher described his wife as "a freak" when it comes to sex, and began describing his sex life. Bond, referring to the digital recorder, said, "Turn that off." Lesher said, "Oh, I don't care about that. It's just for me." Bond then said, "Oh, Okay." And Detective Lesher reiterated, "[T]hat's just for me to remember."

Bond argues that this behavior by Detective Lesher is the same type of behavior this Court condemned in *Leger v. Commonwealth,* 400 S.W.3d 745 (Ky. 2013.) In *Leger*, after being read his rights, Leger agreed to speak with a police officer about several crimes he allegedly committed. *Id.* at 747. When questioned about specific incidents, Leger asked the officer, "What I am telling you now is between us, right. It ain't goin' [unintelligible]?" To which the

6

officer replied, "Right." *Id.* Leger then confessed to several of the alleged offenses. *Id.* Leger sought to suppress his statement arguing that the officer's assurance the statement would be "between us" had vitiated the previously given *Miranda* warnings. Leger also argued that the officer's interrogation style was "so deceptive that it unfairly induced [Leger] to forget that the [officer] was an 'adversary,' and 'revealed an atmosphere' that prompted [Leger] to speak against his better interest." *Id.* at 748.

As to the officer's interrogation style, we discerned "absolutely nothing improper about" his "courteous and friendly demeanor or the impression of cordiality created by his manner of speaking with [Leger]." *Id.* Furthermore, we recognized that "[a]rtful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices, but deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools." *Id.* at 750.

As in *Leger,* we discern nothing improper about Detective Lesher's interrogation style. Although Detective Lesher's statements about his wife may have been deceptive and may have lulled Bond into a sense of security, they were not beyond the bounds of acceptable "clever investigative devices."

Furthermore, Detective Lesher's comments that the digital recorder was "just for me" because he "forgets a lot" do not rise to the level of the statements by the officer in *Leger* and the cases we cited therein. In those cases, the officers specifically stated that the conversation was going to be kept confidential or between the officer and the defendant. That is not what

7

occurred here. Here, Detective Lesher simply stated that the recorder was for his use. He did not state that what Bond said would be kept confidential or that what Bond said would be kept between them. It is the statements a defendant makes that "can and will be used against" him, not necessarily the recording of those statements. If there had been no recorder present or if the recorder had been turned off, the Commonwealth would still have been able to use any statements made against him by Bond.

We are, however, somewhat concerned about Detective Lesher's statement - "We do this all the time. It's no big deal" - prior to reading Bond his rights. Taken out of context, this statement by Detective Lesher could be construed as minimizing the significance of the rights Bond was being asked to waive. However, in the context in which it was made, *i.e.* Bond's familiarity with the process from watching true crime television shows, we cannot say that it vitiated Bond's knowing waiver of his rights.

### 2. *Voluntariness of Waiver.*

During the course of the interview, Detectives Lesher and Cohn told Bond several times that the detectives just wanted to get additional information, that Bond was not "in trouble," and that they did not think there had been an intentional or criminal act. Bond argues this questioning "subverted the *Miranda* warnings that anything [Bond] said could and would be used against him in court" by indicating that "what he said or 'explained' was not going to get him in trouble and ultimately was not a crime." Detective Lesher testified at the suppression hearing that, when he made those

comments, they were true. The detectives had received information from the medical examiner indicating that Hendricks had been strangled to death. At that time they did not know who had strangled her or how she had been strangled. Therefore, the detectives' statements to Bond were not obviously false when made. Furthermore, while the detectives may have downplayed Bond's culpability, they did not, after reading Bond his *Miranda* warning, state that they would not use any statements against him. Statements such as those made by the detectives, while coming close to crossing the line between "clever investigative devices" and prohibited behavior, did not cross that line.

Additionally, Bond argues that the detectives' conduct violated Kentucky Revised Statute (KRS) 422.110, the "anti-sweating" statute by "plying" him with questions. KRS 422.110 provides that:

> No peace officer, or other person having lawful custody of any person charged with crime, shall attempt to obtain information from the accused concerning his connection with or knowledge of crime by plying him with questions, or extort information to be used against him on his trial by threats or other wrongful means, nor shall the person having custody of the accused permit any other person to do so.

Detectives Lesher and Wescott testified at the suppression hearing that they and Detective Cohn asked Bond the same or similar questions several times throughout the course of the interview. By way of explanation, Detective Lesher stated that, to the extent Bond was repeatedly questioned about the events of May 12, it was because Bond kept changing his story. The trial court found this conduct was within the bounds of acceptable and "fairly standard" police practice. We agree.

9

As our predecessor Court held: "Plying with questions means the persistent and repeated propounding of inquiries to elicit a desired answer, carried to such an extent that the prisoner feels required to answer as the questioner wishes in order to escape from the pressure." *Bennett v. Commonwealth*, 242 Ky. 244, 46 S.W.2d 84, 85 (1932). Detectives Lesher and Wescott admitted that they asked Bond the same or similar questions several times. However, a reading of the transcript of the interview does not support Bond's argument that repeated questioning by the detectives was designed to elicit a desired answer. Rather, it was designed to clarify Bond's changing version of events. Furthermore, there is no indication that the detectives exerted any undue pressure from which Bond would have wanted to escape.

### 3. Sufficiency of Trial Court's Findings of Fact.

Finally, Bond argues that the trial court's findings of fact were not sufficient to meet the requirements of Kentucky Rule of Criminal Procedure (RCr) 9.78. However, Bond did not ask the trial court to make additional findings of fact. Therefore, we need not and do not address that issue. *See Vinson v. Sorrell*, 136 S.W.3d 465, 471 (Ky. 2004).

### C.   Admission of Entire Statement.

The Commonwealth indicated that it intended to play portions of Bond's interview for the jury. Bond argued that, if the court permitted the Commonwealth to play part of the interview, it had to play the entire interview. In the alternative, Bond moved the court for an order permitting him to play those parts of the interview wherein he expressed his love for Hendricks. He

10

also sought permission to play those portions of the interview that he believed showed that the detectives planted the seed that he sodomized Hendricks while she was unconscious. The Commonwealth argued that the portions Bond wanted to play amounted to inadmissible hearsay. The court ruled that the Commonwealth could play selected portions of the interview and that Bond could not play the redacted portions of the interview. In doing so, the court noted that what Bond wanted to play for the jury was "classic hearsay," and he could attempt to put the excluded portions of the statement before the jury by testifying or through cross-examination of the detectives.

On appeal, Bond argues that he should have been permitted to play the redacted portions of the statement based on "the rule of completeness." Kentucky Rule of Evidence (KRE) 106. He also argues that the court limited his cross-examination of Detective Lesher so that he could not get the excluded information before the jury. The Commonwealth argues that the trial court did not abuse its discretion by keeping the redacted portions of Bond's statement out of evidence. [5] We address each issue in turn.

The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable,

---

[5] The Commonwealth also argues that the redacted portions of the statement would not have been admissible under KRE 412. While Bond made an argument regarding KRE 412 to the trial court, he does not make it here. Therefore, we do not address it.

11

unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

KRE 106 provides that: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." A party may admit otherwise inadmissible hearsay statements pursuant to KRE 106, but only if "an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning." *Schrimsher v. Commonwealth,* 190 S.W.3d 318, 330-31 (Ky. 2006) (footnote omitted). Therefore, we must determine "whether the meaning of the included portion is altered by the excluded portion." *Commonwealth v. Collins,* 933 S.W.2d 811, 814 (Ky. 1996).

The portions of Bond's statement played to the jury included descriptions of his sexual activity with Hendricks in the early morning hours of May 12, 2010. Bond argues that, to get a complete picture, the jury needed to hear: his descriptions of their varied and active sex life; his statements that he loved Hendricks and intended to marry her; his statements that he did not intend to hurt Hendricks and had not known that he had hurt her; and his statement that he and Hendricks had engaged in consensual anal sex the preceding afternoon.

We agree that the excluded portions of Bond's statements may have given the jury a more complete description of his relationship to Hendricks.

12

However, after reviewing the transcript, we agree with the trial court that the exclusion of those portions did not alter the meaning of the included portions. Furthermore, we note that Bond established through Detective Lesher that Bond and Hendricks were engaged in consensual anal sex the afternoon of May 11 when Shelby arrived and interrupted them; that Detective Lesher brought up rough sex and choking; that Bond had accidentally strangled Hendricks; that Bond denied ever striking Hendricks; and that Bond believed that Hendricks was not dead when he finished having sex with her. Thus, Bond was able to get into evidence the majority of what he wanted through Detective Lesher. Furthermore, the portions Bond was not able to otherwise get into evidence did not alter the meaning of the included portions. Therefore, we discern no abuse of discretion in the trial court's refusal to admit Bond's entire statement.

**B.     The Trial Court did not Err in Denying Bond's Motion for a Directed Verdict as to the Sodomy Charge.**

Bond was convicted of sodomy in the first degree. "A person is guilty of sodomy in the first degree when: . . . (b) He engages in deviate sexual intercourse with another person who is incapable of consent because he: 1. Is physically helpless . . . ." KRS 510.070. Bond's conviction was based on his having had anal sex with Hendricks after she had passed out from drinking too much alcohol. He argues that the only evidence that Hendricks was "physically helpless" when he engaged in anal sex with her was his May 13, 2010, statement, which was not, by itself, sufficient to support his conviction.

13

Bond is correct that, pursuant to RCr 9.60, "A confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed." However, Bond is incorrect that there was not sufficient other proof to support his conviction. The other proof required by RCr 9.60 "relates only to proof that a crime was committed, not to whether the defendant committed it." *Lofthouse v. Commonwealth*, 13 S.W.3d 236, 242 (Ky. 2000). Furthermore, the corroborating proof need not establish beyond a reasonable doubt that a crime occurred, and the court may consider that proof in conjunction with a confession to determine whether a crime occurred. *Young v. Commonwealth*, 426 S.W.3d 577, 583 (Ky. 2014).

Other than Bond's confession, the Commonwealth presented the following evidence that Bond engaged in anal sex with Hendricks while she was unconscious and physically helpless. Shelby testified that Hendricks was unconscious and clothed when he and Bond dragged her into the bedroom and left her on the floor. When Shelby went into the bedroom later that night, Hendricks was nude. The medical examiner testified that she found evidence of anal tearing and contusions when she examined Hendricks. Although the medical examiner could not state conclusively that the tearing occurred through anal sex, she testified that it could have and that the tearing occurred within hours of Hendricks's death. Furthermore, the medical examiner testified that Hendricks was significantly intoxicated, and her level of

14

intoxication[6] would have been consistent with her having passed out and would have impeded her ability to struggle or otherwise resist while being strangled.

Bond argues that Shelby testified that Bond and Hendricks may have been having sex when he got to the apartment, which would be consistent with him having had anal sex with Hendricks several hours before her death, and would have accounted for her anal injuries. He also argues that the medical examiner could not conclusively tie Hendricks's anal tearing to anal sex; could not state whether Hendricks was conscious or not when the tearing occurred; could not state whether any anal sex was consensual or not; and could not state whether the strangulation and the tearing occurred at the same time. All of that is true. However, the issue is not whether Bond presented proof that contradicted his statement; the issue is whether the Commonwealth presented proof that corroborated Bond's statement. As set forth above, the Commonwealth's other proof, in conjunction with Bond's confession, was sufficient to establish that the crime of first-degree sodomy occurred. That is all the Commonwealth was required to prove; therefore, we discern no error in the trial court's denial of Bond's motion for a directed verdict.

---

[6] The medical examiner testified that Hendricks had a blood alcohol level between 0.317% and 0.38%.

15

## IV. CONCLUSION.

For the reasons set forth above, we affirm.

Minton, C.J.; Abramson, Cunningham, Noble and Venters, JJ., sitting.

All concur.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Cicely Jaracz Lambert
Office of the Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General