RENDERED:  OCTOBER 3, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0763-MR

KEMONE TRIBBLE                                                            APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE ANNIE O'CONNELL, JUDGE
ACTION NO. 21-CR-001760

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, KAREM, AND MOYNAHAN, JUDGES.

CETRULO, JUDGE:  Pursuant to his conditional guilty plea, Appellant Kemone Tribble ("Tribble"), appeals an order of the Jefferson Circuit Court denying his motion to suppress statements given during a custodial interrogation.  Tribble argues that his statements were obtained through deception and coercion, rendering those statements and his *Miranda*[1] waiver involuntary, and in violation

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

of his rights under the Fifth and Fourteenth Amendments of the United States Constitution and § 11 of the Kentucky Constitution. After review, we affirm the Jefferson Circuit Court.

## I.     FACTS AND PROCEDURAL BACKGROUND

On June 16, 2021, at 6:20 p.m., an officer with the Louisville Metro Police Department ("LMPD") conducted a stop on Tribble for a traffic violation. Due to the odor of marijuana coming from Tribble's vehicle, the police officer initiated a probable cause search that led to the discovery of two handguns under the front passenger seat. Further investigation revealed that the vehicle driven by Tribble had been reported stolen in an armed robbery on May 10, 2021. Tribble was arrested and transported to the First Division of the LMPD, where he was placed in an interview room and handcuffed to a wall while he awaited questioning.

Later that evening, Detectives Derek Brooks ("Detective Brooks") and Ashley Schaefer ("Detective Schaefer") entered the interview room to question Tribble. The interrogation was captured via Detective Schaefer's body worn camera and later transcribed for the trial court proceedings.[2] Upon entering

---

[2] In addition to the audio and video footage of the interrogation, the record before the Court contains a transcript of the recording, the accuracy of which is not contested by either Tribble or the Commonwealth on appeal and in fact relied upon in both parties' briefs. Therefore, we utilize it in this Opinion.

the interview room, the detectives immediately inquired whether Tribble needed anything and offered him drink, food, and a bathroom break. Detective Schaefer started completing the *Miranda* rights form and acquired basic information from Tribble to include his name and date of birth. Detective Schaefer then asked Tribble if he had ever been in trouble before, to which he replied "no." Detective Schaefer then proceeded to administer the *Miranda* warnings both orally and in writing via a standard LMPD form containing the *Miranda* rights and waiver. The waiver portion contained language to the effect of acknowledging a reading and understanding of the *Miranda* rights and a willingness to forgo asserting those rights and answer questions without counsel being present.

After reading the *Miranda* rights from the form, Detective Schaefer asked Tribble "[w]hat grade did you finish in school?" to which Tribble responded, "tenth." Tribble indicated that he could read and write the English language and was then given the *Miranda* form to which he signed his name under the waiver at 9:51 p.m.

For approximately the first 30 minutes of the interrogation, Tribble maintained a story of purchasing the car the day prior from an unknown stranger for $1,000. Detective Brooks was quick to point out his disbelief.

DETECTIVE [BROOKS]: . . . That's not the truth.

TRIBBLE: What's the truth?

DETECTIVE [BROOKS]: You tell me. That's why we're here. But that's not the truth.

TRIBBLE: That is what I'm telling you. We really bought the car.

DETECTIVE [BROOKS]: No, you didn't.

TRIBBLE: What happened? What happened, dude?

DETECTIVE [BROOKS]: You tell me.

TRIBBLE: I just told you.

DETECTIVE [BROOKS]: I mean, we're not – look, dude, we're not going to beat around the bush, okay?

TRIBBLE: Which –

DETECTIVE [BROOKS]: We're here for a reason. We're here to talk to you, and we're here to try to help you out. But if you're going to continue to go down that path, there's no – there's nothing to talk to me.

TRIBBLE: So how are you all going to help me out, for what?

DETECTIVE [BROOKS]: Dude, you – you're going to be facing some serious charges. You was in a stolen car, and you got two guns in the car.

Detective Brooks continued to press Tribble on the implausibility of his story and began to confront Tribble with details stemming from their investigation of the robbery on May 10, 2021. Specifically, Detective Brooks stated he believed that Tribble did not buy the car the day before, that Tribble in fact had the car for a month, and that Tribble took the car when he and several

-4-

other associates were on the east end of Louisville, checking cars and "hitting licks."

Tribble denied this account but started asking what his charges were along with what else the detectives thought he did. After some more back and forth, Tribble changed his story from being in possession of the car for one day to a few weeks. He maintained his denial of any knowledge that the car was stolen and stated that he got it from a friend. Detective Brooks did not relent.

DETECTIVE [BROOKS]: . . . You've been telling yourself that for so long, you're believing it.

TRIBBLE: What?

DETECTIVE [BROOKS]: That you was passed that car. Dude, I'm telling you right now, it's time to get off the bullshit. Dude, this is not a game.

TRIBBLE: I know. I want to get out of this as much as you trying to help me get out.

At this point, Detective Schaefer chimed in with a more patient and understanding tone and offered Tribble the opportunity to provide the rather benign reason of just having the car to satisfy the basic need for transportation.

Tribble then retold several different versions of how he acquired the vehicle before asking:

TRIBBLE: What are the charges?

DETECTIVE SCHAEFER: Receiving stolen property over 10,000.

TRIBBLE: So what is – is that it?

DETECTIVE SCHAEFER: For that car.

TRIBBLE: Is that it, the only charges?

DETECTIVE SCHAEFER: The other officer's charging you with things that came from, like, the traffic stop. I'm telling you what's stemming from my case.

TRIBBLE: In your case?

DETECTIVE SCHAEFER: Uh-huh.

TRIBBLE: How many cases is there?

DETECTIVE SCHAEFER: Two. . . . That's why I'm here. I don't come out at night unless I get called out. I got called out. That's why we're here.

TRIBBLE: So what do you want me to tell you?

Eventually, Tribble admitted to being in the area of the robbery with two friends to "check" for unlocked cars. He denied knowledge of his friends' real names, claiming to only know them by their "street names." He further described the friends' appearances as "tall" and "white and light skinned." This description prompted Detective Schaefer to describe the east end of Louisville as a wealthier area, one where people who have more money "than [her]self or – or most of police officers" live, and therefore, it stood to reason that wealthier people invest in security cameras. She then informed Tribble of video surveillance evidence capturing two black males – not white or light skinned males –

-6-

committing the robbery and theft of the car.  The ensuing exchange between

Tribble and Detective Schaefer constitutes the crux of this appeal.

TRIBBLE:  So what was you all going to help me with?  How was you all going to help me?

DETECTIVE SCHAEFER:  Well, this is your first charge, right? So you say.  I haven't looked at your record.  I don't know.  You could be an ax murderer for all I know.  I have not looked at your record.  So this is your first record, your first incident –

DETECTIVE [BROOKS]:  As an adult.

DETECTIVE SCHAEFER:  – as an adult.  We're going to be – or I'm going to be the one going to court on you – this case.  So –

TRIBBLE:  So you going to be going against me or with me?

DETECTIVE SCHAEFER:  Not – well, hopefully, with you.

TRIBBLE:  With me?

DETECTIVE SCHAEFER:  Hopefully.  I don't want to be going there against you.

DETECTIVE [BROOKS]:  Depending on you.

TRIBBLE:  I mean, I hope you all are with me, not against me.

DETECTIVE SCHAEFER:  The ball's in your court, man.  You know, people with first-time offenses, they get all kinds of stuff.  They get offered diversion, they get offered –

TRIBBLE:  I didn't –

DETECTIVE SCHAEFER:  – probation.

TRIBBLE:  I didn't want this – a charge at all.

DETECTIVE SCHAEFER:  No?  I believe that.  I believe you're a good kid that made a bad decision. Is that right?

TRIBBLE:  Yes, ma'am.

DETECTIVE SCHAEFER:  But you've got to be honest before I can help you.

From thereon, Tribble proceeded to confess to his involvement in the robbery on May 10, 2021, admitting to possessing one of the handguns and stealing the car.  In the final moments of the interrogation, Tribble again asked the detectives how his confession would help him.

TRIBBLE:  How would this help me?

DETECTIVE SCHAEFER:  Well, I will tell you that – because I go to court daily on other cases.  The way I – the way I've done with other cases is people that are truthful and are – give me a truthful statement and are cooperating and honest, I tend to talk to the prosecutors and try to get something set up where we're not sending you away to prison for ten years for this.  You know what I mean?  But I – I – I can't sit here and promise you you're going to get this deal.  I can't do that.  That's up to the prosecutors and the judges.  However, I can speak to your defense attorney and the prosecutors on your behalf and say, look, he was cooperative, he was honest, he is remorseful for what he did.  I can tell you're remorseful, you're sorry for what you did.  He's a kid.  Like, he needs an opportunity to move in the right direction, not something that's going to set him back.  So that's what happens when we go to court, and

hopefully, that's – they do – that does weigh very heavily, . . . and there are avenues for people like you that it's your first time as an adult getting picked up, or even if it's your second or third. I mean, you get a lot of chances. But if you are honest and show that you're remorseful, it does go a long way. It really does. So you are going to get charged tonight, though. I mean, there's nothing we can do about that. The officers pulled you over. That's – you know, that's on them. But you will have court coming up.

Detective Schaefer continued to explain that the judge would set Tribble's bond, which was another aspect over which she had no control. Tribble did not make any other incriminating statements following this exchange. The entire interrogation of Tribble lasted approximately 45 minutes.

Based on the incidents occurring on May 10, 2021 and June 16, 2021, Tribble was indicted by the Jefferson County grand jury on August 17, 2021, in an eight-count indictment with the most serious offense being one count of complicity to robbery in the first degree in violation of Kentucky Revised Statute ("KRS") 515.020.

On June 21, 2022, a year after the custodial interrogation, Tribble filed a motion to suppress his statements on the basis that the detectives employed deception that undercut the *Miranda* warnings and amounted to coercion, thereby rendering Tribble's confession and waiver involuntary and inadmissible. The trial court held a suppression hearing in two parts: the first occurring on July 27, 2022, and the second on January 18, 2023.

At the hearing on July 27, 2022, the Commonwealth called Detective Schaefer as its sole witness. In addition to her testimony, the Commonwealth admitted the complete recording of Tribble's custodial interrogation, along with several clips played during the hearing, and a copy of Tribble's signed *Miranda* waiver. Her testimony established that, prior to questioning Tribble, she and Detective Brooks arrived at LMPD to interview the two passengers in the stolen car driven by Tribble. She confirmed that she advised Tribble of his *Miranda* rights and understood his signature under the waiver portion of the form to indicate that he understood his rights and was willing to speak with the detectives.

During the Commonwealth's direct examination, Detective Schaefer testified that she did not make any threats or promises to Tribble. She further testified that the intent behind her statements that Tribble would need to be honest before she could help him meant that she would relay his acceptance of responsibility and cooperation as mitigation to the prosecution and defense, particularly given Tribble's youth and lack of criminal history as an adult. When questioned about those statements again on cross-examination, Detective Schaefer reaffirmed that she did not say those things as part of a "ruse" and stood by what she said in the recorded interrogation in open court.

At the second part of the suppression hearing on January 27, 2023, Tribble presented the testimony of a psychologist, Dr. Paul Ebben ("Dr. Ebben").

-10-

Dr. Ebben had examined Tribble on November 15, 2022 and January 3, 2023, at the request of Tribble's defense counsel to assess "the issue of competency to waive *Miranda* rights and susceptibility to coercion during questioning." Dr. Ebben prepared a written report documenting his findings and opinion, which was admitted into evidence. His conclusions were based on several screening tests and measurements he administered to Tribble during the two examinations, his clinical interview of Tribble, a phone call with Tribble's mother, and review of two reports from Tribble's juvenile history concerning his competency to stand trial. Additionally, he reviewed the transcript and video recording of Tribble's June 16, 2021 interrogation. He did not review any school or medical records.

In his report and testimony, Dr. Ebben stated that based on the screening tests and measurements he administered, Tribble's Full-Scale Intelligence Quotient ("IQ") was 79, placing Tribble at a borderline range of intellectual functioning. Relying on self-reported information from Tribble and his mother, Dr. Ebben conveyed that Tribble was not placed in special education classes and received good grades, eventually enrolling in Advanced Placement ("AP") classes in high school. However, Tribble reported that his grades began to drop, and he was expelled in the tenth grade due to behavioral, not educational, problems.

Dr. Ebben's conclusion regarding Tribble's understanding of his *Miranda* rights on June 16, 2021, was that "there [was] evidence he understood the elements of the *Miranda* warning," however, "there [was] no guarantee he was capable of generalizing that knowledge to the real-life, real-time situation of being questioned." Dr. Ebben surmised the following:

> [I]t is more likely than not Mr. Tribble was emotionally and intellectually vulnerable when he made a decision to provide law enforcement with information, believing they would or could assist him in his case, and his vulnerability was the result of the combination of three factors: pre-existing ADD [attention deficit disorder], low cognitive functioning in the verbal area (especially comprehension), and presumed anxiety/fear.

Following the hearing, the trial court denied Tribble's motion to suppress his statements. Considering the totality of the circumstances, the trial court ruled that Tribble was properly informed of his *Miranda* rights, that Tribble had the capacity to understand those rights and the consequences of waiving them, and that the detectives' statements to Tribble were not coercive. Here, we highlight the trial court's findings as follows:

> After reviewing the complete statement of the defendant and considering the totality of the circumstances, this Court finds that this exchange between Mr. Tribble and the detectives was not coercive. Within the context of the full statement, it is clear that Mr. Tribble's statement **"So you going to be going against me or with me?"** is not a clarifying question. Rather, the statement is his attempt to bargain for a more favorable outcome in exchange for providing more information. He

-12-

is not confused by his position in the room, nor is he confused about the role of the officers before him. Instead, he is fully aware that what he says will be used in court, and he is trying to gauge his position with the detectives. His question is an opening bid of sorts. He is, in essence, asking the officers: "What are you going to do for *me* if I talk?"

Here, the detectives made no promises. They in no way presented themselves as attorneys or "advocates" for the defendant, nor did they misrepresent the authority they had or would have with the prosecutor or the Court.

On December 15, 2023, Tribble entered a conditional guilty plea to all charges in the indictment, preserving his right to appeal the trial court's denial of his motion to suppress, pursuant to Kentucky Rule of Criminal Procedure ("RCr") 8.09. On June 11, 2024, in accordance with the plea agreement, the trial court sentenced Tribble to a combined sentence of 11 years to serve.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is reviewed by this Court using a two-pronged analysis.

First, the trial court's findings of fact are reviewed for clear error, which are held conclusive if supported by substantial evidence. *Cox v. Commonwealth*, 641 S.W.3d 101, 113 (Ky. 2022) (citations omitted). On appeal, Tribble does not challenge the trial court's findings of fact.

Second, the trial court's application of the law to those factual findings is reviewed using the *de novo* standard: "This means we have 'a duty to

-13-

make an independent evaluation of the record,' and will give no deference to the trial court's ruling." *Id.* (footnote omitted) (citing *Dillon v. Commonwealth*, 475 S.W.3d 1, 10 (Ky. 2015)). Specifically relating to the *Miranda* waiver on appeal – while the ultimate question of voluntariness is a question of fact – we nonetheless review questions of voluntariness, knowingness, and intelligence within a *de novo* review standard due to our obligation to undertake an independent evaluation of the record. *Dillon*, 475 S.W.3d at 9-10 (citations omitted).

## III.   ANALYSIS

On appeal, Tribble argues that the trial court erred by denying his motion to suppress his statements, which Tribble alleges were the result of police deception undermining the rights set out in *Miranda v. Arizona*, *supra*. Specifically, Tribble relies on *Leger v. Commonwealth*, 400 S.W.3d 745 (Ky. 2013), to argue that Detective Schaefer's statement regarding going to court "*with*" as opposed to "*against*" Tribble vitiated the previously given *Miranda* warnings, rendering his waiver and ensuing statements involuntary and/or unknowing. Put another way, Tribble claims this exchange is the equivalent of the detectives telling Tribble that, if he confessed, then they would go to court not only on his behalf but as his advocates, thereby subverting his right to counsel. Tribble suggests that the detectives acted under the guise of defense counsel by

-14-

indirectly promising him that his statements would not be used against him in court. He claims that his low intellectual functioning and untreated ADD made him particularly vulnerable to the deceptive interrogation tactics of the police.

In *Miranda v. Arizona*, the United States Supreme Court held that a suspect must be informed of his/her rights to remain silent and to counsel prior to being subjected to custodial interrogation. 384 U.S. at 444-45. This mandate is necessary due to the inherently coercive nature of custodial interrogations. *Id.* at 448-55. Nevertheless, a suspect may waive those rights and agree to speak with law enforcement.

> The inquiry whether a waiver is coerced has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Cox*, 641 S.W.3d at 114 (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)) (internal quotation marks and citations omitted in original).[3]

---

[3] We note, the crux of Tribble's argument is the *waiver*, not the *confession*. He argues that his **Miranda waiver** was coerced and thus, he did not voluntarily waive his rights to remain silent and to refuse to make incriminating statements. "The question of whether a defendant has voluntarily waived his *Miranda* rights is analyzed somewhat differently than the question of

Accordingly, we address Tribble's arguments: first, whether *Leger* requires remand; second, whether the detectives' statements during the interrogation were coercive; and third, whether Tribble's waiver was unknowing.

### a) **Application of *Leger***

Tribble argues that the trial court failed to recognize that *Leger* embodies the broader principle that it is improper for police to use deceptive tactics to subvert *any* of the constitutional rights protected by the *Miranda* warnings.[4]

In *Leger*, the trooper read the *Miranda* warnings to the defendant before subjecting him to custodial interrogation. 400 S.W.3d at 748. As the questioning progressed, the defendant inquired whether his answers would remain "between us, right" to which the trooper replied, "Right." *Id.* at 748-49. The

---

whether the underlying confession is voluntary." *Matthews v. Commonwealth*, 168 S.W.3d 14, 21 (Ky. 2005); *see also Dillon*, 475 S.W.3d at 13. For instance, a confession may be deemed voluntary under the Due Process Clause of the Fourteenth Amendment yet still be considered compelled under the Fifth Amendment if the second prong, knowing and intelligent, is not satisfied. *Id.* at 13-14 ("Taken together, these inquiries require something more than merely ascertaining whether [the defendant] was willing to answer simple questions put to him by the officer without coercion. His statements may be voluntary under the first inquiry while the apparent waiver of his rights in making such statements can be unknowing and unintelligent under the second inquiry.").

[4] To Tribble's point, the *Leger* opinion is often relied upon for the following principle: "[A]rtful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices, but deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools." *Bond v. Commonwealth*, 453 S.W.3d 729, 734 (Ky. 2015). However, *Leger* did not hold that a kind demeanor alone equates to a promise of confidentiality. *Id.*

-16-

*Leger* Court noted that "[b]y answering in the affirmative, the trooper confirmed that [the defendant]'s words *would not* be used against him in a court of law. With that misconstruction of the right to remain silent, [the defendant] was induced to incriminate himself." *Id.* at 750. Moreover, the Court observed that "there was no ambiguity in either [the defendant]'s question or in the trooper's answer." *Id.* The trooper's assurance of confidentiality directly undermined the warning of the right to remain silent; therefore, any statement obtained after that assurance must be suppressed.

> Requiring police to give the proper *Miranda* warning and then allowing it to be countermanded with a false assurance that the suspect's statements *will not* be used against him, "requires suppression of any statements the suspect makes thereafter during the interrogation." When that occurs, . . . the warnings required by the United States Supreme Court in *Miranda* are vitiated. Statements made in response to such assurances of confidentiality are statements made in violation of *Miranda* and must be suppressed.

*Id.* at 751 (quoting *Lee v. Maryland*, 12 A.3d 1238, 1248 (Md. 2011)).

The primary issue before the *Leger* Court focused on police promises of confidentiality that contravene the right to remain silent and the caution that anything said may be used against the defendant in court. Although we do not read *Leger* as restricted to promises of confidentiality, we also do not agree that *Leger* affords Tribble the relief he seeks.

-17-

For instance, in *Bond v. Commonwealth*, the defendant argued that the detective engaged in similar conduct prohibited by *Leger* when he made statements regarding his use of the digital recorder during the interrogation because he "forget[s] a lot" and that it was "just for [him]." 453 S.W.3d 729, 733 (Ky. 2015). Prior to administering the *Miranda* warnings, the detective confirmed with the defendant that he watched true crime television series and then said "I'm gonna read you your rights, we do this all the time. It's no big deal." *Id.* The *Bond* Court found nothing improper about the detective's demeanor nor his statements concerning the recorder, noting the latter did not rise to promises of confidentiality. *Id.* at 734. The Court, however, expressed concern that the detective's prelude to the *Miranda* warnings could be interpreted as an attempt to "minimize[e] the significance of the rights [the defendant] was [about] to waive." *Id.* Given that the statement was made in the context of confirming the defendant's awareness of the rights from true crime stories, the Court could not "say that it vitiated [the defendant]'s *knowing* waiver of his rights." *Id.* (emphasis added). Regarding the voluntariness of his waiver, the defendant claimed the detectives' statements that they "just wanted to get additional information, that [he] was not 'in trouble,' and that they did not think there had been an intentional or criminal act" were ploys to subvert the part of the *Miranda* warning that a suspect's statements may be used against him in court. *Id.*

The *Bond* Court rejected this argument as well, noting that the detectives' statements "were not obviously false when made." *Id.*

> Furthermore, while the detectives may have downplayed [the defendant]'s culpability, they did not, after reading [him] his *Miranda* warning, state that they would not use any statements against him. Statements such as those made by the detectives, while coming close to crossing the line between "clever investigative devices" and prohibited behavior, did not cross that line.

*Id.*; *see also Gore v. Commonwealth*, 712 S.W.3d 808, 815 (Ky. App. 2025) (citing *Leger*, 400 S.W.3d at 750) (declining to consider "deceptive stratagems" as part of the custody analysis but noting "authorities are not permitted to lie 'about the rights protected by *Miranda* and the legal effects of giving up those rights[.]'").

Hence, when applied to the particular facts of this case, *Leger* does not offer Tribble the relief he seeks.

### b) Voluntariness of Waiver

Our Supreme Court noted, in *Bailey v. Commonwealth*, that "the threshold question to a voluntariness analysis is the presence or absence of coercive police activity[.]" 194 S.W.3d 296, 300 (Ky. 2006). In the context of a *Miranda* waiver, "[a]ny evidence that the accused was *threatened, tricked, or cajoled into a waiver* will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476 (emphasis added). When

-19-

undertaking a voluntariness analysis, a court must look at the totality of the circumstances, including "both the characteristics of the accused and the details of the interrogation[.]" *Bailey*, 194 S.W.3d at 300 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Furthermore, the presence or absence of "official coercion is to be determined objectively: 'we are not analyzing whether [Tribble] believed he was being coerced, but simply determining whether the officers' actions were objectively coercive *in light of* [Tribble's] mental deficiency.'" *Keeling v. Commonwealth*, 381 S.W.3d 248, 268 (Ky. 2012) (quoting *Bailey*, 194 S.W.3d at 302 n.1).

We begin with our consideration of characteristics specific to Tribble. As previously noted, he was 19 years old at the time of his interrogation. Tribble indicated that he completed the tenth grade in school and understood the English language. His only other involvement with the criminal justice system was as a juvenile. Relying on Dr. Ebben's testimony and conclusions, Tribble argues his low intelligence and untreated ADD made him unable to meaningfully recall and assert his constitutional rights, making him more vulnerable to coercion.

Tribble points out that the Commonwealth did not offer any evidence to the contrary; however, this argument fails for the following reasons. First, Dr. Ebben's testimony and report noted that Tribble understood his rights at the time

of the interrogation, but that there was "no guarantee he was capable of generalizing that knowledge to the real-life, real-time situation of being questioned." Moreover, as argued by the Commonwealth, Dr. Ebben's conclusions suffer from several shortcomings and inconsistencies, including the 17 to 19 month delay in his examinations from the time of the interrogation, the reliance on self-reported educational and medical history without verification through official records, and the contradictory factors of Tribble's low intelligence but otherwise satisfactory educational performance.[5]

Most importantly in the context of Tribble's argument on appeal – that the factors of his youth, absence of an adult criminal record, low intelligence, and untreated ADD made it more likely that the detectives' coercion would overbear his will – Dr. Ebben's testimony and conclusions are relevant only insofar as there is an objective determination of coercion.

It is uncontested that Tribble was offered and declined food, drink, or a bathroom break. Detective Schaefer read aloud the form enumerating Tribble's *Miranda* rights, and Tribble signed the waiver acknowledging them. In the ensuing interrogation, Tribble never invoked his right to remain silent nor his right

---

[5] For instance, Dr. Ebben stated that Tribble reported no placement in special education classes and to the contrary claimed to have been enrolled in AP courses in high school. Additionally, Tribble reported expulsion due to behavioral, not educational, reasons. There were no school records reviewed nor medical records supporting a diagnosis of ADD.

to counsel. While the detectives were persistent in their questioning and confronting Tribble with what they believed to be untruths in his stories, they were not physically threatening or emotionally abusive.[6] As in *Leger*, "we see absolutely nothing improper about [Detective Schaefer's] courteous and friendly demeanor or the impression of cordiality created by [her] manner of speaking with [Tribble]. There is nothing wrong with civility in police interrogations." 400 S.W.3d at 748. The primary offense Tribble raises is Detective Schaefer's statement concerning going to court *with* as opposed to *against* Tribble. We provided such a detailed account of the interrogation in this Opinion to shed light on the nature of the conversation leading up to that statement.

The record itself reveals that the detectives were interrogating Tribble in their capacity as law enforcement. Tribble exhibited no confusion as to their role. He cast several versions of his story attempting to see which line might catch. When the detectives did not take the bait and confronted Tribble with unfabricated evidence from their investigation, Tribble altered certain details to see if those would garner better results. Even during the more insistent questioning from Detective Brooks, Tribble expressed a desire to help himself out

---

[6] *Cf. Dye v. Commonwealth*, 411 S.W.3d 227, 232 (Ky. 2013) (finding officers' improper and repeated threats to defendant, who was 17 years old, that he would get the death penalty to be objectively coercive).

and mitigate his situation. At no point did either detective go so far as to extend promises regarding the outcome of his case.

In the moments before Detective Schaefer's "going to court" statement, Tribble asked about his charges and how many cases were against him. Detective Schaefer clarified that she was "called out" for her case and that she could only speak to the charges stemming from that investigation. When confronting Tribble with the video surveillance evidence, Detective Schaefer referred to herself "or most of police officers" as not having large enough salaries to support living in a wealthier neighborhood. In response to learning about surveillance footage capturing two black males, it was Tribble himself who reinitiated the discussion of how his confession would help him.

Detective Schaefer testified that her statement meant that she would relay Tribble's cooperation (or lack thereof) to the prosecution and defense counsel. *See Peak v. Commonwealth*, 197 S.W.3d 536, 542 (Ky. 2006) (citing *Skaggs v. Commonwealth*, 694 S.W.2d 672, 677 (Ky. 1985)) ("The detective did not make threats or promises to [the defendant] to obtain his confession. His representation that he would inform prosecuting authorities of his cooperation does not render the confession involuntary."). Her statements were not so insidious as to represent herself as being Tribble's "in-court advocate," and do not rise to the blatant contradiction of the *Miranda* rights condemned in *Leger*.

Therefore, the circumstances surrounding the interrogation itself do not amount to coercion.

While the factor of an individual's mental disabilities must be considered under the totality of the circumstances when determining voluntariness, "the mere existence of a mental condition, by itself and apart from its relation to police coercion, does not make a statement constitutionally involuntary." *Rogers v. Commonwealth*, 86 S.W.3d 29, 37 (Ky. 2002) (citing *Lewis v. Commonwealth*, 42 S.W.3d 605, 612 (Ky. 2001)) (considering defendant's IQ of 65-66 as a factor to determine voluntariness). Key to this part of our voluntariness analysis is "the record reflects no attempt by the investigating officers to 'take advantage' of [Tribble]'s low intelligence." *Id.*; *see also Keeling*, 381 S.W.3d at 269 (noting that there was "no evidence that the police *exploited* [defendant's] mental [condition] to obtain a confession"); *Bailey*, 194 S.W.3d at 303 (quoting *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) ("[I]f mental impairment of whatever kind should have been reasonably apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary.")). Even if Tribble struggled to remember and assert his rights, the only evidence of this struggle is Dr. Ebben's expert belief confined to the confidence level of "more likely than not." Our

analysis, based on the totality of the circumstances, leads us to conclude that the detectives' actions were not so overreaching as to constitute coercive conduct.

### c. Knowing and Intelligent Waiver

The second prong of the effective-waiver inquiry looks to whether the defendant waived his rights "with a full awareness . . . of the right being abandoned and the consequences of the decision to abandon it." *Cox*, 641 S.W.3d at 114 (quoting *Spring*, 479 U.S. at 573). This inquiry requires "totality of the 'particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). Related to our voluntariness analysis, "precedent from [the Kentucky Supreme Court] is clear that a diminished intellectual capacity does not categorically prevent an individual from waiving his or her *Miranda* rights." *Cox*, 641 S.W.3d at 115 (reviewing whether the defendant's *Miranda* waiver was knowing).

Tribble does not directly contest the trial court's holding that his waiver was knowing. Instead, Tribble merely cites to *Leger* that deception concerning the *Miranda* rights and waiver may invalidate a waiver as involuntary and *unknowing*. However, despite Tribble's alleged low intelligence, presumed anxiety, and ADD, "his demeanor and interactions with the police demonstrated that he was fully aware of the situation. . . . He remained calm throughout the

interview process and at no time appeared confused or anxious about having waived his rights." *See Taylor v. Commonwealth*, 276 S.W.3d 800, 807-08 (Ky. 2008) (finding that the Commonwealth met its burden of establishing a voluntary, knowing, and intelligent *Miranda* waiver by the defendant who was 17 years old, of low intelligence, and in special education classes). As such, Tribble did not establish that his waiver was unknowing.

## IV.  CONCLUSION

Based on the totality of circumstances, the detectives' conduct did not amount to coercion and Tribble's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Therefore, we AFFIRM the judgment of the Jefferson Circuit Court denying Tribble's motion to suppress his statements.

ALL CONCUR.

BRIEFS FOR APPELLANT:

F. Todd Lewis
Louisville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Brystin Denguessi Kwin
Assistant Attorney General
Frankfort, Kentucky